655 A.2d 1292

**Randall BRANDON, D.V.M., P.A., et al.**

v.

**Linda C. MOLESWORTH.**

**No. 791 Sept. Term, 1994.**

Court of Special Appeals of Maryland.

March 29, 1995.

168

E. Alexander Adams (Betty Smith Adams and Adams & Adams, on the brief), Ellicott City, for appellants.

Alan Hilliard Legum of Annapolis, for appellee.

Argued Before WILNER, C.J., and CATHELL and HOLLANDER, JJ.

HOLLANDER, Judge.

Based on a claim of sexual discrimination, Linda Molesworth, D.V.M., appellee, filed suit in the Circuit Court for Anne Arundel County, alleging common law wrongful discharge by her former employers, Dr. Randall Brandon and Randall Brandon, D.V.M., P.A., appellants.[1] On September 13, 1993, a jury awarded Molesworth $39,189 in damages. From that judgment, appellants have lodged their appeal.

The evidentiary centerpiece of Molesworth's suit was her contention that, at the time of discharge, she specifically asked if she was being terminated because she was a woman. Dr. Jeffrey Palmer, a veterinarian in Brandon's employ,[2] allegedly responded, "That's part of it" and Brandon supposedly nodded in agreement.

---

1. Molesworth sued Brandon individually, alleging "that as a professional services corporation, [Brandon] is not relieved of personal liability." Like the parties themselves, we shall not distinguish between the individual and the business entity for the purposes of this decision. Rather, we shall collectively refer to both as the "employers" or as "appellants."

2. After Brandon, Palmer was the senior person in the practice. As of the trial, Palmer anticipated acquiring an ownership interest in the practice.

As appellants employ fewer than fifteen employees, they are statutorily exempt from the *enforcement* provisions of the Maryland Fair Employment Practice Act (the "Act"), Md. Code Ann., Art. 49B, §§ 1–18 (1994). Section 16(a) of the Act prohibits, *inter alia,* discrimination in the workplace based on gender. Accordingly, we must determine whether Molesworth may recover from a small employer based on a common law cause of action for wrongful discharge. If so, we must discern whether the evidence presented at trial supports appellee's claim. In resolving that issue, we must ascertain the standard of causation that governs an action for wrongful discharge and the applicable burdens of proof.

We conclude that the Act does not bar a common law claim for wrongful discharge against an employer who is statutorily exempt from suit under the Act. We are of the view that Molesworth presented sufficient evidence from which a reasonable jury could rationally have concluded that Brandon's decision to discharge Molesworth was caused by discriminatory intent. But as the trial court erroneously omitted an important instruction to which appellants were entitled, we shall reverse and remand for a new trial.

## Factual Background

Most of the facts are undisputed. In any event, we must review the evidence in the light most favorable to Molesworth. *Cavacos v. Sarwar,* 313 Md. 248, 250, 545 A.2d 46 (1988).

Brandon, a veterinarian, maintains a practice of veterinary medicine specializing in the treatment of thoroughbred race horses. In 1987, Brandon offered employment to Molesworth, pending her successful graduation from the University of Pennsylvania Veterinary School and her licensing. Molesworth was hired to replace Dr. Joseph Rumsey, who had been fired in 1987. From July 1, 1988 to July 13, 1990, Molesworth was employed by appellants, pursuant to employment contracts dated July 1, 1988 and July 1, 1989. At the time of Molesworth's termination on July 13, 1990, she had been compensated at an annual rate of $35,000.

When Molesworth began work on July 1, 1988, she was Brandon's first female full-time veterinarian. Through his professional corporation, Brandon has employed a varying number of full-time veterinary doctors; while Molesworth was employed there, the corporation had four full-time veterinary positions and less than fifteen employees altogether. Brandon testified that the success of his practice depends upon client satisfaction with the veterinarians.

As the most junior and least experienced member of the practice, Molesworth was responsible for performing the bulk of the work at the "Lasix barn." Essentially, Lasix duties included giving horses Lasix shots prior to races, approving medications, examining horses after races for conditions requiring attention, and performing other miscellaneous tasks. These duties apparently involved relatively little thought or effort and entailed considerable periods of idleness. Although the other members of the practice worked Lasix barn duties, they did so less frequently than Molesworth.

In December, 1988, and again in March, 1989, Molesworth received bonuses that were calculated from her base salary. On Molesworth's first anniversary of employment, Brandon offered her a renewal contract for another one-year term at $30,000 salary, which Molesworth accepted. Thereafter, some of Brandon's clients began complaining about Molesworth. One of them, Dennis Manning, indicated that he did not want Molesworth to work in his barn because he did not want a female veterinarian. In August, 1989, Brandon gave Molesworth another bonus—also based on salary—and attached a note that stated as follows: "Linda, you are doing a very good job and I appreciate your efforts. Don't worry about the Mannings. We can't please them all. He's the one with the problem. Thanks, Randy."

In December, 1989, Molesworth again received a salary-linked bonus. Brandon verbally complimented Molesworth's work and he sent another note:

Linda, hopefully you can find a way to spend the bonus. It is my pleasure to be able to give it. As a practice we must

really put an effort into the equipment care. These costs are escalating rapidly so for all our best interests, I'd appreciate your efforts in this area. You are doing very well in the practice and the clients are quite happy with you. Thanks, Randy.

Through December, 1989, the practice and distribution of duties did not significantly change. Molesworth never had any complaints with how she had been treated during the first 21 months of employment. Problems began to surface after April 1, 1990, when Dr. Mark Akin left the practice. The first concern involved Akin's departure from the practice. A horse trainer and a van driver, neither of whom were employed by Brandon, gave Akin a going-away dinner to which Molesworth was not invited. One witness later characterized the dinner as a "raunchy bachelor party." Molesworth learned of the party at a meeting held during the second week of April, 1990. According to Molesworth, when she indicated that her feelings were hurt by not being invited, Brandon laughed and commented that she would have been the only woman present.

At the same meeting, Brandon informed Molesworth about complaints that he had received regarding her performance. According to Molesworth, Brandon said that he was not sure why the clients were complaining, as "[Molesworth's] veterinary work is fine." Brandon also commented, "They've never had a female veterinarian work for them before." Brandon had no suggestions for Molesworth as to how to improve her work; when she asked for advice, Brandon replied, "just keep doing what you're doing because you are doing a good job and give them some time."

Molesworth also was offended by an incident that occurred after Akin left. She claimed that, ordinarily, if Brandon came to a racetrack at which one of his staff was working, he would personally confer with the staff member. On the day in question, when Molesworth was working at the Bowie Racetrack, Brandon did not visit Molesworth personally. Instead, he left a note on Molesworth's car windshield, which said: "I'm here, go to the races [at Laurel]."

Due to the advent of simultaneous racing at the Laurel and Pimlico racetracks in the Spring of 1990, the quantity of Lasix work increased dramatically. Accordingly, Brandon began to contract the majority of the Lasix duties to Dr. Peyton Jones, whose practice exclusively consisted of Lasix work. Also, in May, 1990, Dr. Greg Fox was hired to replace Akin. Nevertheless, at least partly due to the increase in volume, Molesworth's work continued to consist largely of Lasix barn duties throughout the spring. Although Molesworth complained that she was being given an unfair proportion of Lasix duties, she continued to work at the Lasix barn. Molesworth added that, when she discussed the Lasix schedule with Brandon in June, 1990, he indicated that he was giving Fox a lighter Lasix schedule than she had been given when she was the junior member because Brandon wanted Fox to meet more clients, and "that's just the way it's going to be." Molesworth also claims that, as a result of the increased Lasix load, she had to miss the discussions Brandon held at the end of the day with the members of his practice.

On July 1, 1990, Molesworth's second anniversary of employment, her salary was increased by $5,000. Yet thirteen days later, Molesworth was informed that the practice would not renew her contract. In the ensuing discussion with Palmer and Brandon,[3] Molesworth asked why she was being terminated. Brandon informed her that at least eight clients had complained about her work and had asked Brandon not to assign Molesworth to perform any duties other than routine work. According to Brandon, the clients' concerns focused on Molesworth's inflexible attitude, as well as upon the quality of her work. Brandon further explained that Molesworth's complaints as to the Lasix scheduling had nothing to do with his decision; he also stated that *he* had no quarrel with the quality of appellee's veterinary work. According to Molesworth, she pointedly asked if she was being fired because she was a woman, and Palmer replied, "Yes, that's part of it."

---

**3.** The parties later referred to this discussion as Molesworth's "exit interview."

Further, according to Molesworth, Brandon did not say anything, but he nodded in agreement.

At trial, Ms. Nancy Heil, a horse trainer, testified on behalf of Molesworth. She said that she had not had any problems with Molesworth's skill, technique, or attitude. On cross examination, however, Heil admitted that she had only used Molesworth for minor, routine matters.

When they testified, Palmer and Brandon both denied Molesworth's allegations of the specific statements she attributed to them, including Palmer's statement and Brandon's nod during the exit interview. Brandon testified that the reason for Molesworth's discharge had nothing to do with her sex; rather, it was based on the increasing volume of client complaints.

Appellants also called six trainers and three former employees of the practice, including Akin. The trainers confirmed that they had complained repeatedly about Molesworth's intractability and about the quality of her work.[4] They corroborated Brandon's testimony that they had asked Brandon not to assign Molesworth to anything other than minor and routine procedures. The former employees told of the difficulties they had had in working with Molesworth, her inflexible scheduling demands, and deficiencies in her work.[5]

Additionally, appellants called Dr. Jean Dobson, to whom an employment offer had been made a few months after Molesworth was released. Dobson said she had declined the position because she was earning more money working for the Federal Food and Drug Administration.

---

4. For example, Stephen Casey testified that Molesworth's failure to "tap" his horse's ankles properly caused the horse's ankles to swell, which resulted in Casey being unable to participate in a race.

5. Aiken testified that Molesworth had been having problems giving shots. He explained that, when not given properly, shots can create a visible "knot" in the horse's neck. Aiken also testified that while knots are unusual for experienced veterinarians, Molesworth would cause knots at least once a week, which upset trainers.

At the close of Molesworth's case, and again at the close of all the evidence, appellants moved for judgment under Md. Rule 2–519; the court denied both motions. After the jury returned a verdict for Molesworth, appellants filed a timely Motion for Judgment Notwithstanding the Verdict ("JNOV"), for New Trial, or for Revision of Judgment; the court denied appellant's post-trial motions, and this appeal followed.[6]

### *Issues Presented*

Appellants present seven questions for our consideration:

1. "Whether the lower court erred in its rulings granting [Molesworth's] judicially-created abusive discharge claim broader remedies/rights against a statutorily-exempt small employer/defendant than [Molesworth] could have pursued against a larger, statutorily-included employer/defendant.

2. "Whether the lower court erred in failing to grant Appellants' Motion for Summary Judgment.

3. "Whether the lower court erred in failing to grant Appellants' Rule 2–519 motions [for judgment].

4. "Whether the lower court erred in its evidentiary rulings.

5. "Whether the lower court erred in its instructions to the jury.

6. "Whether there was legally sufficient evidence to support the Jury's verdict for [Molesworth] and/or its determination of damages.

7. "Whether the lower court erred in failing to grant Appellants' post-trial motions."

---

**6.** Appellants also filed a motion for summary judgment that was heard before trial. Brandon and Palmer both denied Molesworth's allegations as to Palmer's statement and Brandon's nod at the time of discharge. Based on the conclusion that Palmer's statement and Brandon's nod could provide an evidentiary basis for liability, if believed, and because the issue of credibility was for the jury to decide, the court denied that motion.

We find no error as to the issues raised in questions 1, 2, 3, 6, and 7 and answer those questions in the negative. But for the reasons we shall explain below, we hold that the trial court erred in its instructions to the jury. We therefore answer question 5 in the affirmative and shall reverse and remand for a new trial. Of the various evidentiary issues raised under question 4, we shall address only one, which is relevant to this appeal, as we perceive that it is likely to arise on remand. *See* Md.Rule 8–131(a). We decline to reach the remaining evidentiary issues.

## *Discussion*

### I. Common Law Wrongful Discharge

It is undisputed that at the time of her discharge on July 13, 1990, Molesworth was an at-will employee. In Maryland, with few exceptions, at-will employment has been held to be terminable by either party at any time for any reason whatsoever. *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464 (1981) (citing *St. Comm'n on Human Rel. v. Amecom Div.*, 278 Md. 120, 360 A.2d 1 (1976), *Vincent v. Palmer*, 179 Md. 365, 19 A.2d 183 (1941), and *W., B. & A.R.R. Co. v. Moss*, 127 Md. 12, 96 A. 273 (1915)). Thus, the Court said: "The common law rule, applicable in Maryland, is that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." *Adler*, 291 Md. at 35, 432 A.2d 464. *See also Suburban Hosp. v. Dwiggins*, 324 Md. 294, 303, 596 A.2d 1069 (1991); *Hrehorovich v. Harbor Hospital*, 93 Md.App. 772, 784–85, 614 A.2d 1021 (1992); *Castiglione v. Johns Hopkins Hosp.*, 69 Md.App. 325, 338, 517 A.2d 786 (1986); *see also generally* Jane P. Mallor, *Discriminatory Discharge and the Emerging Common Law of Wrongful Discharge*, 28 Az.L.Rev. 651 (1986); Comment, *Guidelines for a Public Policy Exception to the Employment At Will Rule: The Wrongful Discharge Tort*, 13 Conn.L.Rev. 617 (1980–81).

Although the common law at-will rule has not been abrogated, statutory exceptions have been "engrafted" that limit the

previously unfettered discretion to discharge at-will employees. *Adler*, 291 Md. at 35, 432 A.2d 464; Gil A. Abramson & Stephen M. Silvestri, *Recognition of a Cause of Action for Abusive Discharge in Maryland*, 10 U.Balt.L.Rev. 258, 260–62 (1981). Of particular relevance to this case is the Act, which prohibits termination for discriminatory reasons.[7] Section 16(a)(1) of the Act makes it unlawful, *inter alia*, for an employer "[t]o fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ... unrelated in nature and extent so as to reasonably preclude the performance of the employment...." [8]

 In *Adler*, 291 Md. 31, 432 A.2d 464, the Court of Appeals recognized the common law tort of wrongful discharge,[9] constituting in this State the first judicially created exception to the at-will doctrine. The Court reviewed the evolving case law from other jurisdictions, noting that the overwhelming majority that adopted the cause of action defined it as a tort in which the employee may recover damages arising from the employee's discharge under circumstances violating a clear mandate of public policy. *Id.* at 35–41, 432 A.2d 464. The "public policy" could derive from statute,

---

7. Other examples of statutory limitations bearing on termination of at-will employees include Labor and Employment Art. § 9–1105 (1991 Replacement vol.), which prevents employers from firing employees in retaliation for filing a claim, § 43 of the Maryland Occupational Safety and Health Act (Art. 89 (1991 & Supp.1994)), which protects employees against discharge for participating in its enforcement, and Cts. & Jud.Proc. Art., §§ 8–105, 8–401 (1989 & Supp.1994), which protects employees from discharge for serving on a jury.

8. Consistent with the principles of at-will employment, in passing Title VII, the federal counterpart to Art. 49B, Congress sought to "balance ... employee rights and employer prerogatives...." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239, 109 S.Ct. 1775, 1779, 104 L.Ed.2d 268 (1989).

9. The terms "abusive" and "retaliatory" are synonymous with "wrongful" for the purposes of this tort. *Adler*, 291 Md. at 36, 432 A.2d 464 n. 2.

judicial decision, administrative regulation, or from any other appropriate source. *Id.* at 45, 432 A.2d 464. In deciding whether a policy will support a cause of action, however, the touchstone must be clarity. *Id.* at 42–43, 432 A.2d 464. The Court determined that the public policy in question [10] was not sufficiently clear to support the particular claim in issue. *Id.* at 43–47, 432 A.2d 464.

In the wake of *Adler,* the focus of many wrongful discharge cases has been the clarity of the public policy at issue. For example, in *Kern v. S. Baltimore Gen. Hospital,* 66 Md.App. 441, 504 A.2d 1154 (1986), an employee discharged for absenteeism due to a work-related injury alleged that the statutory policy underlying the Workman's Compensation Act applied to her discharge. This Court reviewed the statutory policy, which expressly precludes discharge "solely" because the employee has filed a claim under the Workman's Compensation Act. *Id.* at 441, 504 A.2d 1154 (citing Art. 101, § 39A (1985)). From the language of the statute, we concluded that the policy did not contain a sufficiently clear mandate regarding discharges that were not "solely" due to a filed claim. *Id.*[11]

---

**10.** In *Adler,* the employee alleged that he was discharged because he was about to expose illegal accounting practices. He argued that his discharge contravened public policy arising from the criminal laws relating to commercial bribes, falsification of corporate records, and the need to prohibit illicit accounting practices.

**11.** *See also, e.g., Bleich v. Florence Crittenton Svces, Inc.,* 98 Md.App. 123, 134–40, 632 A.2d 463 (1993) (Fam.Law. Art. §§ 5–502(b), 5–702(1), and 5–704(a) provide clear mandate of public policy in favor of reporting child abuse); *Miller v. Fairchild Indus., Inc.,* 97 Md.App. 324, 335, 629 A.2d 1293, *cert. denied,* 333 Md. 172, 634 A.2d 46 (1993) (right to free speech under U.S. and Maryland Constitutions did not provide clear mandate of public policy with respect to *private* employers; even if discharge had generally chilling effect on whistleblowers, private employer cannot violate free speech by discharging employee); *Lee v. Denro, Inc.,* 91 Md.App. 822, 830–37, 605 A.2d 1017 (1992) (public policy against "fraud" does not support a cause of action because the conduct that the employer tried to force the employee to do did not constitute fraud under the specific statute cited as the source of public policy); *Kessler v. Equity Mgmt., Inc.,* 82 Md.App. 577, 586–90 (1990) (employer/landlord, who discharged employee for refusing to break into and search defaulting tenants' apartments, violated a clear mandate of public policy arising out of the constitutionally protected right to privacy); *Townsend v. L.W.M. Mgmt., Inc.,* 64 Md.App. 55, 69–70, 494

 Molesworth avers that Art. 49B, § 14 articulates a clear mandate of public policy to support her claim. Section 14 states, in pertinent part, as follows:

### Declaration of Policy.

It is hereby declared to be the policy of the State of Maryland ... to assure all persons equal opportunity in receiving employment and in all labor management-union relations regardless of race, color, religion, ancestry or national origin, sex, age, marital status, or physical or mental handicap unrelated in nature and extent so as to reasonably preclude the performance of the employment, and to that end *to prohibit discrimination in employment by any person, group, labor organization or any employer or his agents.*

(Emphasis added).

Nevertheless, relying on Art. 49B, § 15(b) [12] and *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), Brandon argues that the Act applies only to employers of at least fifteen people; because Brandon has fewer than fifteen employees, he claims he is exempt from the enforcement mechanism in the statute and from its policy. Further, in light of *Makovi*, he claims that no common law action should be available here.

Brandon also contends that, even if an action for common law wrongful discharge is available, it would be fundamentally unfair, illogical, and contrary to the legislative intent, for an employee to have greater remedies against an exempt employer than she would otherwise have against a non-exempt employer. He claims, therefore, that at a minimum, he ought to

---

A.2d 239, *cert. denied*, 304 Md. 300, 498 A.2d 1186 (1985) (although there is a clear mandate of public policy under Art. 100, § 95 against forcing employees to take lie detector tests, once employee has taken such test, employer can fire based on test results indicating that employee had stolen).

**12.** Specifically, § 15(b) defines "employer" as "a person engaged in an industry or business who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year...."

have the same protections that the Act affords to larger employers, such as the short statute of limitations and the 30–month limit on back pay. Art. 49B, §§ 9–12 (enforcement powers of the Md.Comm'n on Human Relations).[13] Brandon argues that the statutory exemption for small employers demonstrates that the Legislature sought to protect small businesses like his from the burdens of tort litigation. If he is subject to suit, Brandon argues that he will be placed in the anomalous position of being worse off than a larger employer whose conduct is within the purview of the Act.

In *Makovi*, the Court limited the availability of the common law wrongful discharge action. There, relying on the policy enunciated in Art. 49B, § 14, plaintiff sued her employer, a corporation *not* statutorily exempt, claiming sex discrimination when she was discharged during pregnancy. The Court held that a claim of common law wrongful discharge, by its nature as a purely supplemental remedy, was not available to plaintiff, because the Act set forth its own remedy. *Id.* at 609, 561 A.2d 179. Essentially, the Court concluded that, as the tort is supplementary and not complementary, it is only available where it provides relief that does not overlap an already extant remedy; only where a clear mandate of public policy would otherwise be left unvindicated is the common law tort available. *Id.* at 611–12, 561 A.2d 179. Observing that Art. 49B authorized individuals to file complaints with the Maryland Commission on Human Relations (the "HRC") and empowered the HRC to investigate and remedy acts of employment discrimination, the Court declined to extend the common law tort of wrongful discharge to discriminatory employment practices covered by the enforcement mechanisms in the Act.

---

**13.** The exemption provision for small employers may result in placing them in a less favorable position with respect to the applicable statute of limitations and damages. Yet appellants have not pointed to any legislative history to support their claims that the employee's remedies in a common law wrongful discharge action are no greater than the remedies available under the Act. In any event, based on our holdings, we decline to reach the question of whether the limits on recovery specified by the Act apply to a common law wrongful discharge action instituted against a statutorily exempt employer.

*Id.* at 621–26, 561 A.2d 179. *See also generally* Comment, *Torts—Wrongful Discharge—Maryland Limits The Scope Of The Wrongful Discharge Tort Where Statutory Civil Remedies Are Available,* 20 U.BALT.L.REV. 290 (1990).

As *Makovi* construed a claim against an employer who was within the purview of the Act, it is not applicable here. Rather, we find persuasive the federal court's analysis in *Kerrigan v. Magnum Entertainment, Inc.,* 804 F.Supp. 733 (D.Md.1992).

In *Kerrigan,* the court faced the precise issue raised here by Brandon. Construing Maryland law, the court held that a common law cause of action for wrongful discharge may be lodged against a defendant who employs fewer than fifteen people. In so holding, the court disagreed with the defendant's contention that the statutory exclusion of small employers was "the result of deliberate legislative intent to avoid burdening small businesses with suits alleging discrimination in employment." 804 F.Supp. at 735. What the court said is pertinent here:

> ... Maryland courts have not read art. 49B as evidencing an intention to grant small business a charter to discriminate. To the contrary, they have held that while art. 49B exempts small business from its burdensome administrative requirements, there is no reason to construe art. 49B as exempting small business from its anti-discrimination policy. Because art. 49B evidences a clear policy against employment discrimination, and because this Court finds no legislative intent on the part of the General Assembly to exempt small business from the policy animating art. 49B, the Court finds that an *Adler* wrongful discharge claim based on alleged discrimination will lie in Maryland for claimants whose former employers employ fewer than fifteen persons....

> The Court recognizes that the result reached herein means that cases involving small employers will be litigated in court without an initial attempt at administrative conciliation. This result, however, is compelled by the *Adler*

Court's decision to allow a common law cause of action for wrongful discharge whenever the alleged grounds for termination violate a clearly established public policy of this State.

804 F.Supp. at 736.

We agree with Molesworth that Art. 49B, § 14 constitutes a "clear mandate of public policy." We also agree with *Kerrigan* that the policy applies to all employers, including those, like appellants, who employ less than fifteen people.[14]

Maryland has never interpreted the Act's exemption for small employers as a license to discriminate. Indeed, such a suggestion is patently ludicrous. Rather, as the Court said in *Nat'l Asphalt Pavement Ass'n, Inc. v. Prince George's Co.*, 292 Md. 75, 437 A.2d 651 (1981): "Employers with less than fifteen employees are not permitted by the state statute to discriminate in their employment practices; they simply are not covered." *Id.* at 79, 437 A.2d 651. Further, "in enacting

---

**14.** Our conclusion that the policy applies to all employers is buttressed by our review of some of the legislative history. Both the Act and Title VII, the federal counterpart to the Act, originally exempted employers having fewer than 25 employees. Art. 49B, § 18(b) (1968) (which has since been renumbered as § 15(b)); 42 U.S.C. §§ 2000e(b) (1966). In 1972, Congress expanded the coverage of Title VII by reducing the exemption to cover only those employers having fewer than 15 employees. H.R. 1746, 92d Cong., 2d Sess., 86 Stat. 103 (1972). In 1973, to conform the Act to Title VII, the General Assembly analogously limited § 18(b). 1973 Md.Laws Ch. 493.

In increasing the number of employers potentially subject to the administrative remedies under Title VII, Congress was nonetheless concerned with overburdening the Equal Employment Opportunity Commission (the federal counterpart to the HRC). *See, e.g.,* H.R.Rep. No. 238, 92d Cong., 2d Sess. U.S.Code Cong. & Admin.News 1972, pp. 2137–86 (1972). But we are unable to find anything in the Title VII legislative history regarding the 1973 amendment to suggest that the purpose of the small employer exemption is to protect small employers from the policy of Title VII. Similarly, we believe the corresponding exemption in the Act was not intended to benefit small employers. Rather, it appears that the exemption was enacted to protect the HRC and the administrative process from the burdens of an unmanageable case load that would necessarily follow if the Commission had to investigate claims against every employer, regardless of size. *See also Nat'l Asphalt Pavement Ass'n, Inc. v. Prince George's Co.*, 292 Md. 75, 79, 437 A.2d 651 (1981).

legislation prohibiting discriminatory employment practices, [the Legislature] did not intend to preempt the area." *Id.* at 80–81, 437 A.2d 651. *See also Kerrigan,* 804 F.Supp. at 736 (quoting same language).

Nevertheless, as in *Kerrigan,* and in contrast to *Makovi,* Molesworth does not have a statutory remedy under the Act, because § 16(a) only prohibits discriminatory acts by "employers" who, pursuant to § 15(b), employ at least fifteen people.[15] As Brandon employed fewer than fifteen people, Molesworth could not pursue a statutory remedy. Consequently, Molesworth was entitled to assert a claim for common law wrongful discharge.

## II. Mixed–Motive Cases

Our conclusion that a claim for common law wrongful discharge was viable here does not end our inquiry. We must also determine whether Molesworth presented sufficient evidence to withstand a motion for judgment or a motion for JNOV. In order to resolve that question, we must analyze the evidence in light of the proper standard of causation and the appropriate burdens of proof.

We are not aware of any Maryland case that has considered the causation standard applicable to a common law wrongful discharge action. Therefore, cases arising directly under Art. 49B and its federal counterpart, Title VII, codified at 42 U.S.C. §§ 2000e through 2000e–5 (1988), are instructive.[16]

---

**15.** A similar policy limitation is expressed in Title VII, the Federal counterpart to Art. 49B. The limitation, 42 U.S.C. § 2000e(b) (1988), denies a remedy against employers employing fewer than fifteen people. *See also Kerrigan,* 804 F.Supp. at 734 n. 2.

**16.** To resolve questions as to the proper interpretation of Art. 49B, Maryland courts have often found federal cases arising under Title VII to be persuasive. *See, e.g., Chappell v. S. Md. Hosp., Inc.,* 320 Md. 483, 494, 578 A.2d 766 (1990); *Md. Shipbuilding & Drydock Co., Inc. v. Md. Comm'n on Human Rel.,* 70 Md.App. 538, 545–50, 521 A.2d 1263 (1987); *Md. Comm'n on Human Rel. v. Wash. Co. Community Action*

In Maryland, in a statutory employment discrimination action, the plaintiff must prove that the employer committed a discriminatory employment act in violation of § 16.[17] In order to prevail in such an action, the plaintiff must prove that he or she is a member of a class protected by the Act and that the employer's decision to discharge was made *because of* the employee's membership in that class.[18] Art. 49B, § 16(a). A

Council, Inc., 59 Md.App. 451, 455–56, 476 A.2d 222 *cert. denied,* 301 Md. 354, 483 A.2d 38 (1984).

Prior to 1991, the salient portion of Title VII was similar in wording and substance to Art. 49B, § 16(a). In November, 1991, however, Congress significantly altered Title VII by Pub.L. 102–166, Title I, §§ 105(a), 106, 107(a), 108, Nov. 21, 1991, 105 Stat. 1074–76. Nevertheless, cases construing Title VII before the effective date of the 1991 amendments remain persuasive.

17. A complaint filed with the HRC under § 9A precipitates certain preliminary procedures under § 10 to resolve the matter without litigation. If these procedures fail, the HRC will bring the matter before a hearing examiner, who will hear evidence under the terms specified in § 11. If the examiner finds that the employer "has engaged in any discriminatory act," the examiner may order limited equitable relief permitted under § 11(e). The refusal to reconsider a finding of discrimination *vel non* is a final, appealable order under State Gov. Art., § 10–215 (1993) (recodified at § 10–222 (Supp.1994), Art. 49B, § 10(d)).

18. In the instant case, based on the allegations of Palmer's statement at the time of discharge, adopted by Brandon, Molesworth has offered direct evidence of discrimination. In the absence of such direct evidence, however, Molesworth could have proceeded under the proof scheme developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); the proof scheme discussed in those cases is applicable where, as is often the situation in a discrimination case, the plaintiff lacks direct evidence of discrimination. *See also St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (reaffirming proof scheme). Molesworth has acknowledged that the *McDonnell Douglas–Burdine* proof scheme is inapplicable, as she has proceeded on the basis of direct evidence of discrimination.

The *McDonnell Douglas* proof scheme is an alternative to the presentation of direct evidence. A plaintiff must produce a prima facie case by establishing: "(1) that she is a member of a protected class; (2) that she was discharged; (3) that at the time of her discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) that following her discharge, she was replaced by

critical issue in discrimination cases, therefore, is whether, and the extent to which, the employer discharged the employee "because of" a discriminatory animus or intent. *Cf. Townsend,* 64 Md.App. at 69–70, 494 A.2d 239 (discharge was due to the fact that employer believed employee had stolen, not because employee had refused to take a polygraph test). Perhaps even more fundamental is what the term "because" actually means in the context of discrimination cases.

▪ Those instances in which the employer had *some* discriminatory animus but also had independent, legitimate grounds for discharging the plaintiff have produced problems. In these so-called "mixed-motive" cases, the question arises as to whether, and under what circumstances, the independent, legitimate grounds for discharge overcome the unlawful discrimination, even if the discrimination was a factor in the decision to discharge. In order to determine whether the discrimination *caused* the discharge in a mixed-motive case, we must consider whether the employer's unlawful discriminatory intent or motive played a role in the decision to discharge or if, even without consideration of gender, discharge would have resulted.

Certainly, the mixed-motive problem is present here. Brandon's alleged nod indicated that gender was "a part of" the decision to terminate, but Brandon also presented substantial evidence to establish legitimate reasons to discharge Molesworth, including that his clients were dissatisfied with her.

Other courts considering the mixed-motive question have not agreed on a single standard of causation or the concept of "because." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 238 n.

---

someone of comparable qualifications outside the protected class." *Douglas v. PHH FleetAmerica Corp.,* 832 F.Supp. 1002, 1009 (D.Md. 1993). If the plaintiff meets this burden, the employer bears the burden of production to articulate "a legitimate, nondiscriminatory reason for terminating the plaintiff's employment." *Id.* The articulation of such a reason rebuts the inference of discrimination raised by the prima facie case. Moreover, the plaintiff retains the burden of persuasion that the proffered reason was pretextual and that the employer was motivated by discrimination. *Id.*

2, 109 S.Ct. 1775, 1785 n. 2, 104 L.Ed.2d 268 (1989). Rather, the decisions fall within a spectrum. On one end of the spectrum, if the discrimination played "any part at all," the decision to terminate is illegal. *See, e.g., U.S. v. Hayes Int'l Corp.*, 6 Fair Empl.Prac.Cas. (BNA) 1328, 1330, 1973 WL 302 (N.D.Ala.1973), *aff'd w/o opin.*, 509 F.2d 574 (5th Cir.1975) ("no matter how slight or tangential"). Other cases require the discrimination to have been a "significant factor", *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir.1980), a "substantial part," *Berl v. Westchester Co.*, 849 F.2d 712, 714 (2d Cir.1988), a "motivating factor," *Fields v. Clark Univ.*, 817 F.2d 931, 937 (1st Cir.1987), and a "determining factor," *Mack v. Cape Elizabeth Sch. Bd.*, 553 F.2d 720, 722 (1st Cir.1977) (*i.e.*, "that but for [the discrimination] she would have been re-employed."), in order for the discharge to be found unlawful.[19]

The overwhelming majority of courts have held that the proper standard falls somewhere in the middle. Prior to the Supreme Court's decision in *Price Waterhouse*, there appeared to be a convergence upon a "but for" standard. *Mc-Donald v. Santa Fe Trail Trans. Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976) (to demonstrate that employer's proffered reason for discharge was "pretext," employee need only show that discrimination was "a 'but for' cause."); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 366 (4th Cir.1985) (D.Md.) (citing cases); *see also* Mark S. Brodin, *The Standard of Causation in the Mixed–Motive Title VII Action: A Social Policy Perspective*, 82 COLUM.L.REV. 292, 308 (1982); HENRY H. PERRITT, JR., EMPLOYEE DISMISSAL LAW AND PRACTICE § 7.6, at 378 (2d. ed. 1987). Under this standard, "a plaintiff challenging an adverse employment decision [must] show that, but for her gender (or race or religion or national origin), the decision would have been in her favor." *Price Waterhouse*, 490 U.S. at 238 n. 2, 109 S.Ct. at 1784 n. 2 (citing cases).

---

**19.** We are not aware of any Title VII case that has required a plaintiff to show that discrimination was the "sole" reason for termination. Moreover, that standard was considered and rejected by Congress during the debate over Title VII. 110 Cong.Rec. 13,837–38 (1964).

*Price Waterhouse*, however, precipitated a change in the landscape of Title VII jurisprudence. There, as here, the plaintiff claimed she had been denied promotion, and later constructively discharged, because she was a woman. The employer, on the other hand, contended that she had been fired because of her abrasive, brusque, impatient, and aggressive behavior and her poor interpersonal skills. The plaintiff testified as to statements by her supervisors to the effect that her "flawed 'interpersonal skills' can be corrected by a soft-hued suit or a new shade of lipstick," and that she needed " 'a course at charm school.' " *Id.* at 256, 109 S.Ct. at 1793–94. The district court found that the employer's proffered reason was not pretextual, but as sex played a role in the decision, that court held that the employer had unlawfully discriminated.

On appeal, the Supreme Court splintered. For divergent reasons, six Justices agreed only upon the ultimate holding: [20]

[W]hen a plaintiff in a Title VII case proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account. Because the courts below erred by deciding that the defendant must make this proof by clear and convincing evidence, we reverse the Court of Appeals' judgment against Price Waterhouse on liability and remand the case to that court for further proceedings.

*Id.* at 258, 109 S.Ct. at 1795.

Interpreting 42 U.S.C. § 2000e–2(a)(1, 2),[21] which prohibited, *inter alia*, "discharge ... because of ... sex," Justice

---

**20.** Because the holding was supported by a four-justice plurality with two opinions concurring in result only, the persuasive force of the decision is unclear. Additionally, the holding of *Price Waterhouse* was significantly undercut by Congress. *See* Publ.L. 102–166, Title I, §§ 105(a), 106, 107(a), 108, Nov. 21, 1991, 105 Stat. 1074–76.

**21.** The language of § 2000e–2(a), then at issue, was virtually identical to Art. 49B, § 16(a).

Brennan, writing for the plurality, recognized that a plaintiff need not identify the "precise causal role played by legitimate and illegitimate motivations in the employment decision...." *Id.* at 241, 109 S.Ct. at 1786. He said that "[t]o construe the words 'because of' as colloquial shorthand for 'but-for causation' ... is to misunderstand them." *Id.* at 240, 109 S.Ct. at 1785. Nor do "the words 'because of' ... mean '*solely* because of'...." *Id.* at 241, 109 S.Ct. at 1785 (emphasis in original). Although the employee bears the burden of persuasion that discrimination was "a motivating factor," the employee need not prove that but for the discrimination she would not have been discharged. *Id.* at 240, 109 S.Ct. at 1785. Thus, the plurality said that, to be lawful, discriminatory motives must have been *irrelevant* to the employment decision. Justice Brennan concluded "that Congress meant to obligate [plaintiff] to prove that the employer relied upon sex-based considerations in coming to its decision.... [A] person's gender may not be considered in making decisions that affect her." *Id.* at 241–42, 109 S.Ct. at 1786.

But proving discrimination played a role in the decision does not end the inquiry:

> To say that an employer may not take gender into account ... describes only one aspect of Title VII. The other important aspect of the statute is its preservation of an employer's remaining freedom of choice. We conclude that the preservation of this freedom means that an employer shall not be liable if it can prove that, even if it had not taken gender into account, it would have come to the same decision regarding a particular person. The statute's maintenance of employer prerogatives is evident from the statute itself and from its history, both in Congress and in this Court.

*Id.* at 242, 109 S.Ct. at 1786.

As an affirmative defense, an employer can avoid liability by demonstrating, by a preponderance of the evidence, that the employment decision would have been the same even without taking gender into account. *Id.* at 246,

258, 109 S.Ct. at 1788, 1794.[22] Justice Brennan underscored his theme in stating:

> The central point is this: while an employer may not take gender into account in making an employment decision ... [except in narrow exceptions], it is free to decide against a woman for other reasons. We think these principles require that, once a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed gender to play such a role. This balance of burdens is the direct result of Title VII's balance of rights.

*Id.* at 244–45, 109 S.Ct. at 1787 (footnote omitted).

The plurality cautioned that, in order for a plaintiff to prevail, the discrimination must have been present at the moment the employer arrived at the decision in question. *Id.* at 241, 250, 109 S.Ct. at 1786, 1790–91. Moreover, the plurality recognized that "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision." *Id.* at 251, 109 S.Ct. at 1791. In the words of the Court:

> An employer may not ... prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. Finally, an employer may not meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason.... The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision.

*Id.* at 252, 109 S.Ct. at 1791.

In an opinion concurring in judgment only, Justice O'Connor took issue with the plurality's interpretation of § 2000e–

---

**22.** Justice White agreed with the result, but would have grounded it solely upon a reading of *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *Price Waterhouse,* 490 U.S. at 258-60, 109 S.Ct. at 1794–96 (White, J., conc.).

2(a). After reviewing the legislative history, Justice O'Connor concluded that "because" meant that discrimination must play a "but for" role. *Id.* at 262–63, 109 S.Ct. at 1796–97. She noted that, in contrast to the plurality, her interpretation was consistent with prior Supreme Court cases. *See McDonald,* 427 U.S. at 282 n. 10, 96 S.Ct. at 2580 n. 10; *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (a poor employee should not be entitled to a job merely because employer's improper motive made more certain an already clear decision). Accordingly, she concluded that plaintiffs should bear the burden of demonstrating that illegitimate criteria played "a *substantial* factor in an adverse employment decision." *Price Waterhouse,* 490 U.S. at 265, 109 S.Ct. at 1798. Thereafter, however, she believed that the policies underlying Title VII, traditional tort analysis,[23] and logic all dictate that the burden of persuasion shifts to the defendant to demonstrate that the employment decision did not rest on illicit criteria; the employer is in the best position to produce such evidence. *Id.* at 266, 269, 109 S.Ct. at 1799, 1800–01.

As a prerequisite for shifting the burden of persuasion, Justice O'Connor would require that the plaintiff make a "strong showing" that the illicit motive in fact affected the employment decision.

> [S]tray remarks in the workplace, while perhaps proba-
> tive of sexual harassment, cannot justify requiring the em-
> ployer to prove that its [employment] decisions were based
> on legitimate criteria. *Nor can statements by nondecision-*
> *makers, or statements by decisionmakers unrelated to the*
> *decisional process itself, suffice to satisfy the plaintiff's*
> *burden in this regard....* Race and gender always "play a
> role" in an employment decision in the benign sense that
> these are human characteristics of which decisionmakers
> are aware and about which they may comment in a perfectly

---

**23.** Justice O'Connor cited, for example, *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1, 3–4 (Cal.1948) and *Kingston v. Chicago & N.W.R. Co.,* 191 Wis. 610, 211 N.W. 913, 915 (1927).

neutral and nondiscriminatory fashion.... What is required is what [the plaintiff] showed here: direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.

*Id.* at 277, 109 S.Ct. at 1804–05 (emphasis added).[24]

Whether *Price Waterhouse* altered the standard of causation,[25] we do not read the decision to require a finding of liability whenever the employer possessed *any* degree of discriminatory animus. Even if some unlawful animus contributed to the ultimate employment decision, liability does not necessarily attach. A standard that would permit liability if the discriminatory intent played "any part at all," no matter how minor or slight, does not comport with the better reasoned analyses. "A fundamental precept of our system of justice is that it is unfair to impose liability for a result which would in any event have occurred absent the defendant's

---

**24.** The dissent argued that the burden of persuasion as to the employer's discriminatory intent rested upon the plaintiff at all times in all discrimination cases. *Id.* 490 U.S. at 286–87, 109 S.Ct. at 1809. The Justices noted that the statute never places the burden of persuasion on the defendant, whether the case involves mixed-motives or a single motive. *Id.* at 293–95, 109 S.Ct. at 1813–14. *See also Mullen v. Princess Anne Vol. Fire Co., Inc.*, 853 F.2d 1130, 1138 (4th Cir.1988) (D.Md.) (the burden of persuasion as to motive always rests with the plaintiff, even in mixed-motive case).

**25.** *See Id.* 490 U.S. at 232, 109 S.Ct. at 1781. (plurality) ("We granted certiorari to resolve a conflict among the Courts of Appeals concerning the respective burdens of proof...."); *Id.* at 248, 109 S.Ct. at 1789 (plurality) ("A court that finds for a plaintiff under [the *Price Waterhouse*] standard has effectively concluded that an illegitimate motive was a 'but-for' cause of the employment decision."); *Id.* at 261, 109 S.Ct. at 1796 (White, J., conc.) ("In a mixed-motives case, where the legitimate motive found would have been ample grounds for the action taken, and the employer credibly testifies that the action would have been taken for the legitimate reasons alone, this should be ample proof."); *Id.* at 262, 109 S.Ct. at 1797 (O'Connor, J., conc.) ("a substantive violation of [Title VII] only occurs when consideration of an illegitimate criterion is the 'but-for' cause of an adverse employment action."); *Id.* at 283, 109 S.Ct. at 1807–08 (Kennedy, J., diss.) ("One of the principle reasons the plurality decision may sow confusion is that it claims Title VII liability is unrelated to but-for causation, yet it adopts a but-for standard once it has placed the burden of proof as to causation upon the employer.").

wrongdoing...." *Peters v. City of Shreveport,* 818 F.2d 1148, 1161 (5th Cir.1987) (en banc), *cert. denied,* 485 U.S. 930, 108 S.Ct. 1101, 99 L.Ed.2d 264 (1988). Undoubtedly, "[i]t would be incongruous—and certainly not required by law—to give any employee, even one engaged in the exemplary efforts to vindicate the law of the land, a stranglehold on a job irrespective of that employee's material, work-related flaws." *Williams v. Boorstin,* 663 F.2d 109, 116–17 (D.C.Cir.1980).

 We adopt here the plurality analysis in *Price Waterhouse.* Applying *Price Waterhouse* to this mixed-motive case, our review of the evidence produced at trial, considered in the light most favorable to Molesworth, compels the conclusion that Molesworth presented sufficient evidence to withstand motions for summary judgment, judgment, and JNOV.

Molesworth identified several incidents to support her contention of sex discrimination. She pointed to Brandon's "amusement" at her complaint about not having been invited to Akin's going-away party,[26] to Brandon's original explanation of the clients' complaints as being due to the fact that "[t]hey've never had a female veterinarian work for them before,"[27] and to the fact that Fox had a lower percentage of Lasix work as junior-most person in the practice than Moles-

---

26. We recognize that, under the proper circumstances, "[t]he use of [discriminatory] language by the decisionmaker is relevant as to whether [discriminatory] animus was behind the [employment] decision...." *Mullen v. Princess Anne Vol. Fire Co., Inc.,* 853 F.2d 1130 (4th Cir.1988) (D.Md.). Nonetheless, we observe that most of the statements cited by Molesworth as examples of "discrimination" cannot, in this case, rationally be considered evidence of sex discrimination. *See Douglas v. PHH FleetAmerica Corp.,* 832 F.Supp. 1002, 1010 (D.Md.1993) (employer's stray comment that he preferred to "sit around with the guys" was "innocuous" and "is not evidence of an intention on his part to invidiously discriminate against an employee.").

27. We note that, to the extent Brandon's clients were uncomfortable with a female veterinarian at the outset of Molesworth's employment, Molesworth does not claim that Brandon adopted those views. To the contrary, Molesworth testified as to Brandon's encouragement despite the clients' difficulty in adjusting to her. Moreover, Molesworth admitted that, until April of 1990, she had absolutely no complaints as to how Brandon treated her.

worth had when she had the least seniority. She further complained about Brandon's decision to leave her a note on her car windshield, rather than to talk to her personally. She also pointed to and the fact that she was forced to miss the late-day practice meetings due to her Lasix work. Most significant, of course, was her claim that she was fired because of her gender.

Through her own testimony, Molesworth offered Brandon's notes and comments to show that Molesworth had consistently performed the technical aspects of her duties well, and to establish Brandon's satisfaction with her work. She offered the testimony of only one other witness, a trainer who had no problems with Molesworth's work.

As we see it, the linchpin of Molesworth's case is the actual termination coupled with her testimony about the events during the exit interview. There, Molesworth claims Brandon adopted with a nod Palmer's express statement that Molesworth's sex was part of the reason she was discharged.

The events at the exit interview present direct evidence that Brandon's decision was motivated in some way by Molesworth's sex. Nonetheless, the evidence also demonstrates mixed motives for the decision to discharge. Accordingly, based on *Price Waterhouse,* we recognize a shift of the burden of persuasion to appellants, and our focus turns to their case.

As we have noted, appellants denied Palmer's statement and Brandon's nod. Moreover, appellants presented evidence that, even if Molesworth's gender were a motivating factor in the employment decision, they had legitimate reasons, *at the time of discharge,* to terminate Molesworth, and would have come to the decision to discharge without regard to gender.

Appellants produced considerable evidence, *if the jury chose to believe it,* "justifying their ultimate decision" to terminate. *Price Waterhouse,* 490 U.S. at 248, 109 S.Ct. at 1789. They called six clients to support their contention that Molesworth's personality and performance—not her gender—spawned the complaints and jeopardized business. Their witnesses confirmed the fact that working with or around Molesworth was

not easy. Additionally, Akin gave a specific description of at least one procedure which he believed Molesworth did not perform properly. In short, appellants provided evidence as to legitimate concerns that they claim governed the decision to discharge Molesworth, even if gender also was a factor. In addition, appellants established that it was Brandon who hired Molesworth and then fired her after two years. Soon after, he offered her position to another woman, Dr. Jean Dobson, even before learning of Molesworth's suit.[28]

 Based on *Price Waterhouse*, it is clear that appellants had the burden of persuasion with respect to their claim that Molesworth was discharged because of legitimate business concerns and that, regardless of her sex, the result would have been the same. *Id.* at 248, 109 S.Ct. at 1789. As a general proposition, the resolution of conflicting inferences as to state of mind is within the province of the jury. *DiGrazia v. Exec. For Montgomery Co.*, 288 Md. 437, 445, 418 A.2d 1191 (1980) (citing *Berkey v. Delia*, 287 Md. 302, 324–26, 413 A.2d 170 (1980)). It was the function of the jury, as fact-finder, to evaluate the testimony of the witnesses; the jury was entitled to believe all, some, or none of the testimony of the various witnesses. *DiLeo v. Nugent*, 88 Md.App. 59, 76, 592 A.2d 1126, *cert. granted*, 325 Md. 18, 599 A.2d 90 (1991).

It is apparent that the jury found Molesworth's evidence more credible than the employers' evidence; it was entirely within the jury's province to do so. *U.S. Money v. Kinnamon*, 326 Md. 141, 149–51, 604 A.2d 64 (1992). Further, the jury was entitled to conclude that Brandon did nod and, in so doing, that he admitted that Molesworth's gender was "part of" his decision to discharge her.

 Even if, on the somewhat scanty evidence presented by Molesworth, we would have reached a different conclusion, neither this Court nor the trial court is permitted to substitute its evaluation of the evidence for that of the jury. *Montgom-*

---

**28.** For further discussion as to the impact of this evidence, see the discussion in Section IV, *infra*.

*ery Co. v. Voorhees,* 86 Md.App. 294, 302, 586 A.2d 769 (1991). Accordingly, we must conclude that the court did not err in denying appellants' various motions for judgment based on the evidence presented.

### III. Evidentiary Rulings

Of the evidentiary issues raised by appellants, one is relevant to the issues we consider in this appeal. Specifically, appellants contend that Dr. Palmer's exit-interview statement was hearsay and should have been excluded.

Under Md.Rule 5–802,[29] hearsay is not admissible. Rule 5–803 lists the exceptions to the rule against hearsay; one such exception is listed under Rule 5–803(a)(2): "A statement that is offered against a party and is . . . [a] statement of which the party has manifested an adoption or belief in its truth. . . ." We cannot see how Palmer's statement could fall outside this definition. Assuming the truth of Molesworth's allegations, Brandon's nod clearly constituted either a manifestation of adoption or a belief in the truth of Palmer's statement. The only way to explain the nod—which is clearly admissible—is to introduce the statement that prompted it.

Although Brandon cites authority to the effect that a subordinate's statement is not directly admissible to prove the employer's intent, these cases do not address the issue in question—namely whether a subordinate's statement is exempted from the hearsay rule where the employer has *adopted* the subordinate's statement. Accordingly, we conclude the trial court did not err in permitting Molesworth to testify as to Palmer's statement.

### IV. Jury Instructions

After the court instructed the jury, appellants made several broad exceptions to the court's jury instructions. At issue here is the employers' exception to the court's failure to

---

**29.** Although Title 5 of the Maryland Rules became effective on July 1, 1994, Chapter 8 of Title 5 reflects the pre-existing common law rules regarding hearsay evidence.

instruct that, when the hirer and firer is the same person and the employee is fired soon after being hired, the employer is entitled to an inference that discrimination was not a factor in the employment decision.[30]

Preliminarily, we note that there is a dearth of law concerning jury instructions relevant to the issues that we have already discussed. Indeed, the trial court did a commendable job in setting forth the applicable law in a discrimination case, considering that no Maryland case, heretofore, has precisely set forth the applicable standard of causation in a mixed-motive context.

We are of the view that, with one significant exception, the instructions, taken as a whole, adequately explained the law of causation to the jury.[31] The court essentially instructed the

---

**30.** Appellants also excepted on the grounds that the instructions were inconsistent, and therefore confusing; the court improperly failed to limit the jury's consideration of damages to 30 months of back pay; and the court erred in instructing on general tort damages.

**31.** At the close of the trial, the court instructed the jury, in pertinent part, as follows:

The Plaintiff in this case has the obligation to convince you by direct or indirect evidence that it's more likely than not, or more probable than not, that the Defendant intentionally discriminated against her.

 * * * * * *

Now, as I said before, I—I hate to repeat this, but I got to put it in context for you. I told you what she's got to prove, that the Defendant intentionally discriminated against her. It's not whether the trainers discriminated against her. They may have. He's not liable for what they did. It would be—have to be that the Defendant discriminated against her.

 * * * * * *

An employer may fire an employee for any reason or for no reason. That's—that's in an at-will situation. The only limit on this right is if the motivation for the firing violates a clear public policy of Maryland.

 * * * * * *

To find that the Plaintiff was wrongfully discharged, you must find that her termination was motivated by sex discrimination. In other words, the Plaintiff was fired because she was a female.

If you find that she was fired for another reason, you can't find for the Plaintiff. You have to find for the—for the Defendant. This is

jury that liability could not be found if the employer had legitimate reasons to terminate, and would have terminated regardless of gender. Moreover, appellants can have no complaint as to the causation instructions, because the court gave almost all of the instructions requested by appellants. Nor did the court instruct the jury, as *Price Waterhouse* requires in a mixed-motive case, that the employer had the burden of proof to show, by a preponderance of the evidence, that it had legitimate grounds for the decision to discharge at the time of the discharge, and that the decision to terminate would have been the same notwithstanding the consideration of the employee's gender.[32]

Appellants are, however, correct in maintaining that the trial court erred in failing to give the substance of one of the instructions proffered by appellants. Relying on *Proud v. Stone*, 945 F.2d 796 (4th Cir.1991), they requested an instruction to the following effect:

> In cases where the hirer and firer are the same person, there is a strong inference that the discharge was not due to sex discrimination, because it does not make sense that someone would hire a member of a class he does not like, only to discharge that person once he or she is in the job.

---

true even if you find the Defendant fired the Plaintiff for what you considered an unfair reason, or a matter that could have been handled with better communication.

* * * * * *

The Plaintiff must prove the Defendant intentionally discriminated [against] the Plaintiff. That is, but for the Plaintiff's gender the Defendant would not have made the decision not to continue the Plaintiff's employment.

The mere fact that the Plaintiff is a woman and her employment was not continued is not sufficient in and of itself to establish the Plaintiff's claim.

**32.** On remand, the trial court should, of course, modify any instructions regarding causation in a mixed-motive context to conform to the requirements of *Price Waterhouse*. In particular, the court should include an instruction concerning the shifting burden of proof in light of evidence of discrimination, as well as an instruction to the effect that the employer could avoid liability by proving, by a preponderance of the evidence, that the employment decision would have been the same notwithstanding any discriminatory intent.

... In such a situation you are instructed [that] such a circumstance creates a strong inference that the employer's stated reason for acting against the employee is not pretextual; that is to say that the decision in this case was for reasons other than sex discrimination.

Appellants also cite *Lowe v. J.B. Hunt Transport, Inc.*, 963 F.2d 173, 175 (8th Cir.1992) for the proposition that two years between hiring and firing is a sufficiently short time to permit such an inference.

In *Proud,* an age discrimination case,[33] the employee was fired six months after having been hired. The employee had no direct evidence of discrimination, and the employer showed that the person who fired the employee was the same person who had hired him just a few months earlier. After reviewing the facts alleged in the pleadings, the district court dismissed the complaint. Affirming, the Fourth Circuit observed that, "[f]rom the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.' " 945 F.2d at 797 (citation omitted). The Court held that, "where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Id. See also Id.* at 798 (characterizing the inference as "powerful" and "strong").

The rationale of *Proud* has been followed in later Fourth Circuit cases, as well as in other federal circuits. *See, e.g., Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 513 (4th Cir.1994) (in age discrimination case, the employer hired another older person when plaintiff was hired, and the other employee was not discharged along with plaintiff; both facts are relevant to defendant's contention that the case is governed by *Proud* ); *Lowe,* 963 F.2d at 174–75 (in age discrimi-

---

**33.** The case was filed under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (1988).

nation case, the court granted motion for judgment at end of plaintiff's case because a jury finding of discrimination when plaintiff had been fired two years after being hired "would have been wholly unreasonable."); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 847 (1st Cir.1993) (in age discrimination case, defendant was entitled to summary judgment based on *Lowe* and *Proud* because defendant gave plaintiff a raise two years before firing defendant, and retained another protected employee); *Moore v. Reese*, 817 F.Supp. 1290, 1299 (4th Cir.1993) (D.Md.) (in age discrimination case, plaintiff failed to proffer a prima facie case; additionally, plaintiff was in a protected class when hired, and did not present anything to undermine the inference discussed in *Proud* ); *Herbig v. Int'l Bus. Machines Corp.*, 796 F.Supp. 865, 864 (D.Md.1992) (motion to dismiss granted in age discrimination case because claim of "some sudden discriminatory animus springing up" was so incredible it "does not wash in the tub of common sense.").

■ We agree with the general proposition that, where the hirer and firer are the same person and the employment period is sufficiently short, the obvious inference is that the decision to discharge was not caused or motivated by discrimination. But deciding which conclusions are reasonable to infer from a given set of facts is precisely the jury's function. *DiGrazia*, 288 Md. at 445, 418 A.2d 1191. Indeed, the *Proud* rationale begs a crucial factual question: exactly *how* short must the employment be for the inference to arise? Logically, the shorter the time span, the more potent is the inference. We can discern no bright line to help establish what time span commands a particular conclusion and what does not.

■ At the same time, we acknowledge that the inference recognized by *Proud* and *Lowe* is rational and important; based on the facts of this case, appellants were entitled to an instruction similar to the one they requested.[34] We hold,

---

34. Appellees do not claim that the court was entitled to deny the requested instruction merely because the proposed instruction submitted was not precisely appropriate. Certainly, the trial court was not obligated to use the exact phraseology in appellants' proposed instruc-

therefore, that the court erred in failing to instruct the jury that, if they found that the hirer and the firer was the same person and if they further found that the employment period was sufficiently short, they *could* infer, if they chose to do so, that the discharge was not due to discriminatory intent. In the context of this case, we cannot say that the omission of the instruction was harmless or that, even if the court had given the requested instruction, the outcome would have been the same. Accordingly, we must remand the case for a new trial.

**JUDGMENT REVERSED; CASE REMANDED FOR NEW TRIAL; COSTS TO BE PAID BY APPELLEE.**

---

tion. But if the principle for which the instruction was sought was essentially correct, appellants were entitled to *some* instruction that adequately expressed the law. Md.Rule 2–520(c). *See also Privette v. State,* 320 Md. 738, 747–48, 580 A.2d 188 (1990) (although court need not give proposed instruction, which was a confusing "mish-mash," the court erred in not instructing the jury at all as to the issue in question).