665 A.2d 297

Robert Fulton BAGWELL, Jr.

v.

PENINSULA REGIONAL MEDICAL CENTER, et al.

No. 1866 Sept. Term, 1994.

Court of Special Appeals of Maryland.

Sept. 28, 1995.

472

474

**476**

478

David B. Love (Paul R. Levene, P.A. on the brief), Baltimore, for appellant.

Bruce S. Harrison, Baltimore (Alice P. Estill and Shawe & Rosenthal, Baltimore, and William G. Duvall and Duvall & Duvall of Salisbury, on the brief), for appellees.

Argued before FISCHER, HARRELL and HOLLANDER, JJ.

HOLLANDER, Judge.

Robert Fulton Bagwell, Jr., appellant, was terminated from his employment as a Special Commissioned Police Officer at Peninsula Regional Medical Center ("Peninsula").[1] Thereafter, he filed suit in the Circuit Court for Wicomico County against Peninsula, Alonzo Tull (head of Peninsula's security division), Craig Koppenhaver (Peninsula's Director of Personnel), and Jeffrey Corrigan (Peninsula's Vice President of Human Resources), appellees herein. In his Second Amended Complaint, Bagwell asserted a plethora of claims against appellees: breach of contract, abusive discharge, intentional interference with contractual relations, intentional interference with prospective relations, defamation, invasion of privacy/false light, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent investiga-

---

1. When Bagwell was hired, Peninsula was known as Peninsula General Hospital Medical Center. It was renamed in December 1991.

tion. The court granted appellees' motion for summary judgment on all counts.[2.]

Appellant presents one broad issue for our review: "Whether the trial judge erred in granting, without a hearing, Appellees' Motion for Summary Judgment as to all causes of action asserted by Appellant." He contends that the court erred in failing to recognize actual disputes of material fact. As we perceive no error, we shall affirm.

### *Factual Background*

The summary of facts that follows was gleaned from the pleadings and the evidence produced in connection with appellees' motion for summary judgment. To the extent there is any factual dispute, we have cast the facts in the light most favorable to Bagwell, as we are reviewing the trial court's resolution of the motion for summary judgment.

On December 4, 1989, Peninsula, a hospital located in Salisbury, Maryland, hired Bagwell as a security officer.[3] The parties did not execute a written contract of employment. But, upon hiring Bagwell, Peninsula gave him a copy of its "Employee's Handbook," which discusses, among other things, the hospital's policies on discipline and termination. Bagwell was supervised by Tull who, in turn, reported to Koppenhaver and Corrigan. Bagwell's duties primarily concerned controlling the flow of visitors in the hospital emergency room, and occasionally assisting in controlling violent patients. For about two and a half years, all of Bagwell's job performance evaluations were exemplary.

---

**2.** Bagwell filed his Second Amended Complaint in conjunction with his response to appellees' motion for summary judgment. Thereafter, appellees filed a motion to strike the Second Amended Complaint, but the court never directly resolved the motion to strike. We shall assume, for the purposes of this appeal, that the court denied the motion to strike when it entered judgment against Bagwell.

**3.** Bagwell was appointed by the Governor as a "Special Commissioned Police Officer" pursuant to Md.Ann.Code of 1957, Art. 41 § 4–901 *et seq.* (1992). *See* discussion on wrongful discharge, Section I.B & n. 3, *infra.*

Bagwell was terminated by Peninsula on July 17, 1992. The event precipitating Bagwell's discharge occurred on July 9, 1992. At about 11:30 p.m., while Bagwell was on duty, Juan Rivero was brought into the emergency room. Rivero had been suffering from multiple epileptic seizures over a thirty minute period, apparently brought about by his consumption of twelve cans of beer. He had been treated *en route* with valium, and by the time he arrived at the emergency room, the convulsions had ceased. Nevertheless, Rivero thrashed violently and shouted abusively, threatening to kill hospital staff if they did not immediately release him.

The attending physician ordered that Rivero, as he lay on a gurney, be restrained, and three people attempted to comply: Karen Malone, a nurse; Willie Ames, a nursing assistant; and Bagwell. Ames and Malone positioned themselves by Rivero's legs, and Bagwell stood by Rivero's head. Although they initially secured Rivero with soft restraints, Rivero quickly broke free. Then, while Bagwell, Ames, and Malone attempted to secure Rivero with leather straps, Rivero bit Bagwell on the right wrist. Other than Bagwell, no one saw Rivero bite appellant. Bagwell thereafter struck Rivero on the top of the head.

There is essentially no dispute that Rivero bit Bagwell. What the parties dispute is the time interval between the bite and the strike. In the light most favorable to Bagwell, he reflexively hit Rivero during the bite in an attempt to get Rivero to let go.

Rivero became even more angry and violent after being struck. Bagwell was asked to leave the room and another security officer, who had been waiting outside the emergency room, took over for Bagwell. After leaving the emergency room, Bagwell went to the security office and prepared a statement concerning the incident. He never sought medical treatment for the bite. In the meantime, after calming down somewhat, Rivero began complaining about having been punched by the security guard and he threatened to sue the hospital. He claimed that Bagwell's punch had broken his nose, but Ann Lynch, a nurse present in the emergency room

during the incident, saw no evidence that Rivero had suffered any injury from Bagwell's blow. Within an hour of his arrival at Peninsula, Rivero discharged himself against medical advice.

Rivero's wife called Trina Powell, Peninsula's Administrative Supervisor of Nursing, on July 10, 1992, demanding to know the identity of the officer who hit Rivero. Powell contacted Tull who, along with Koppenhaver, initiated an investigation. Tull immediately placed Bagwell on paid leave pending the outcome of the investigation.

On July 13, 1992, Tull and Koppenhaver interviewed Malone, Ames, and Lynch. Each witness had, by that point, already prepared a handwritten statement. Ames later indicated that he had prepared his statement specifically because Powell had asked him to do so, due to her concern that Peninsula would be sued.[4] Following each interview, Tull and Koppenhaver together drafted a typed, undated statement reflecting their understanding of the witness's version of events as related during the interview. Each witness signed the typed statement, confirming his or her agreement with the facts presented in the typed statement.

According to Lynch's original statement, she first entered the emergency room while Bagwell, Ames, and Malone were attempting to restrain Rivero. She saw Bagwell strike Rivero with a closed fist on the top of his head,

> hard enough that everyone in the room heard it. [Bagwell] looked up at me and said "he bit me, nobody bites me." After this the [patient] became more combative screaming at [Bagwell], saying he was going to sue because security had hit him. The [patient] eventually calmed down after Fulton Bagwell left the room.

The typed statement indicated, in relevant part, as follows:

> Ms. Lynch stated that when she entered the room she observed Karen Malone ... and Willie Ames ... restrain-

---

4. In his brief, Bagwell asserts that Powell was dissatisfied with Ames's original statement, and so ordered Ames to re-write it. Bagwell provided no evidence in support of this assertion.

ing the arms of a combative patient. Officer Bagwell was standing at the head and behind the patient. She stated that she did not witness the patient bite Officer Bagwell. Ms. Lynch estimated that approximately thirty (30) seconds elapsed between her arrival in the room and the point where she observed Officer Bagwell strike the patient with a closed fist on top of his head. Ms. Lynch also confirmed that she did not witness the patient biting Officer Bagwell prior to his striking the patient.

Ms. Lynch stated that after striking the patient, Officer Bagwell looked up at her and said "He bit me, nobody bites me."

Lynch never repudiated any portion of either statement. Also, in a deposition taken later, Lynch indicated that she was watching Rivero constantly during the entire thirty second period between her entry and Bagwell's strike, but she never saw the bite.

Malone wrote in her original statement that all three were attempting to restrain Rivero, with Bagwell standing by Rivero's head and Malone standing at Rivero's right side. While she was attempting to restrain Rivero's right arm, she

heard a SMACK, looked up and saw [the patient with his] head turned up toward [Bagwell]. [The patient] stated "You punched my face!" and [Bagwell] replied "You bit me!" I did not witness the actual incident.

The typed version of Malone's account of events was essentially consistent with her original statement. It added that she had "indicated that she observed no marks on the patient or Officer Bagwell that were related to the incident." Malone never repudiated any portion of either statement.

According to Ames's handwritten statement, dated July 9, 1992, he indicated that he and Bagwell entered the emergency room together to help restrain a combative patient. Ames continued:

Officer Bagwell proceeded to help hold the patient, when all of a sudden Officer Bagwell said, "I will teach you not to

bite people." I heard a thump. The patient said he hit me in my face. The patient proceeded to call him nasty names. The patient said he was going to get a lawyer and sue Officer Bagwell.

Ames's typed statement indicated, in pertinent part, as follows:

Mr. Ames stated that he had restrained the patient's arm when he heard Officer Bagwell state that the patient bit him. Mr. Ames stated that he heard Officer Bagwell say, "I will teach you not to bite people." Mr. Ames said that he then heard a thump. Mr. Ames did not see Officer Bagwell punch the patient nor did he see the patient bite Officer Bagwell. Mr. Ames also stated that he observed a bruise on the patient's forehead after he heard the thump.

In a deposition taken during discovery, Ames repudiated the implication that he had already restrained Rivero when Bagwell first spoke; Rivero was still unrestrained at that time. Ames affirmed the remainder of the statements.

Corrigan called Rivero's wife on July 14, 1992, and he wrote a memorandum to the file purporting to memorialize the conversation. In the memorandum, Corrigan indicated that he told Ms. Rivero that he "had become fully aware of most of the facts surrounding the situation," and apologized to her. Corrigan then assured her that Peninsula "had thoroughly investigated the situation and that [Peninsula] took the incident very seriously and [he was] dealing with the employee involved appropriately."

On July 17, 1992, Tull and Koppenhaver ordered Bagwell to report to Tull's office. According to Bagwell, they accused him of committing an unnecessary act of punitive retaliation between fifteen and thirty seconds *after* Rivero had bitten him. Bagwell denied this, claiming he acted reflexively, while Rivero was still biting him, solely to get Rivero to cease biting. Bagwell claims Tull and Koppenhaver refused to allow him access to the written statements and, after the discussion, handed him a "pink slip"—Peninsula's standardized disciplinary action form—that had been prepared *in advance* of the

meeting, informing him of his termination. Bagwell thus claims the meeting was a sham, that the advance preparation of a notice of termination indicated that Tull and Koppenhaver had predetermined the outcome of the meeting and were never interested in what Bagwell had to say.

The disciplinary action notice reads, in part, as follows:

**On** July 9, 1992, **you failed to comply with Hospital policy as follows:**

Mistreatment of a patient. You were observed hitting a restrained patient with a closed fist to his head.

**Conference with employee:**

You have admitted that you hit this patient in the head although you indicated that it was only a reflex action. An investigation of this incident revealed that the patient was restrained and that the patient was not biting you at the time you punched him in the head. Therefore, your action was not for the purpose of defending yourself, but rather a retaliatory act against the patient which you undertook at least fifteen seconds after the patient had bitten you. This constitutes an inappropriate and excessive force on your part.

**As a result, we therefore find it necessary to**

We find it necessary to terminate your employment effective immediately.

(Bold type indicates pre-printed text).

Following his discharge, Bagwell was in "total shock." He became severely depressed, had difficulty sleeping, became introverted, lost his appetite, and was embarrassed to go out in public. Also, sometime in late July, 1992, a local newspaper reported the emergency room incident, stating that Bagwell had broken Rivero's nose. The article further related that Donna Richardson, spokesperson for Peninsula, said that Bagwell had been terminated as a result of the incident and that Peninsula had apologized to the Rivero family. The majority of the article, however, relied on Rivero's statements of fact and opinion.

Thereafter, Bagwell applied for unemployment benefits from the Department of Economic and Employment Development ("DEED"). Upon request from DEED, Koppenhaver, on behalf of Peninsula, sent DEED a statement summarizing the reasons for Bagwell's discharge. DEED subsequently denied Bagwell unemployment benefits for nine weeks.

Bagwell and Rivero filed criminal battery charges against each other. After a court trial, both men were acquitted.

Bagwell later sought employment with the Ocean City Police Department ("OCPD") and the Wicomico County Department of Corrections ("WCDOC"). In connection with each of these applications, Bagwell signed a consent form, expressly authorizing all prior employers to release information concerning Bagwell's previous employment and exonerating prior employers from all liability stemming from such release. In response to requests from OCPD and WCDOC, Koppenhaver, on behalf of Peninsula, sent a statement to each, summarizing the reasons for Bagwell's discharge. In addition, Koppenhaver discussed Bagwell's excellent prior employment history and indicated that Bagwell would be a capable police officer notwithstanding his lapse in judgment. Peninsula acknowledged that Koppenhaver also spoke with representatives of both prospective employers, but Koppenhaver averred that his oral comments did not include any information outside the matters in the file. Nevertheless, both OCPD and WCDOC declined to hire Bagwell.

## *Discussion*

### I. Scope of Review

▆ The court granted summary judgment on all counts, without a hearing and without explaining the reasons for its decision.[5] The court is, however, presumed to know the law.

---

5. Maryland Rule 2–311(f) bars the court from rendering a decision that is "dispositive of a claim without a hearing if one was requested...." In this case, however, neither side requested a hearing in connection with appellee's motion for summary judgment.

*Quinn v. Quinn*, 83 Md.App. 460, 466, 575 A.2d 764 (1990); *see also Myers v. Estate of Alessi*, 80 Md.App. 124, 560 A.2d 59, *cert. denied*, 317 Md. 640, 566 A.2d 101 (1989) (appellant, in demonstrating both error and prejudice, bears burden of overcoming presumption that court knew and correctly applied the law).

 In deciding a motion for summary judgment pursuant to Maryland Rule 2–501, the trial court must decide whether there is any genuine dispute as to material facts and, if not, whether either party is entitled to judgment as a matter of law. *Warner v. German*, 100 Md.App. 512, 516, 642 A.2d 239 (1994); *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 737–38, 625 A.2d 1005 (1993); *Bits "N" Bytes Computer Supplies, Inc. v. Chesapeake & Potomac Telephone Co. of Md.*, 97 Md.App. 557, 576–77, 631 A.2d 485 (1993), *cert. denied*, 333 Md. 385, 635 A.2d 425 (1994); *Seaboard Surety Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 242–45, 603 A.2d 1357 (1992). In the absence of a dispute of material facts, our role is to determine whether the trial court was legally correct. *Beatty*, 330 Md. at 737, 625 A.2d 1005.

 In resolving a motion for summary judgment, the trial court may not determine the credibility of witnesses. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 326, 389 A.2d 887 (1978). Rather, the court must resolve all disputes of fact, along with all inferences that can be drawn from the evidence and pleadings in the record, against the moving party. *Comm'l Union Ins. Co. v. Porter Hayden Co.*, 97 Md.App. 442, 451, 630 A.2d 261 (1993), *rev'd on other grounds*, 339 Md. 150, 661 A.2d 691 (1995).

 Moreover, the party opposing summary judgment must present admissible evidence demonstrating the existence of a material dispute. *Porter Hayden*, 97 Md.App. at 451, 630 A.2d 261. Mere formal denials or general allegations of a dispute are not sufficient to establish the dispute. *Seaboard Surety*, 91 Md.App. at 243, 603 A.2d 1357; *see also King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Hoffman Chevrolet, Inc. v. Washington Co. Nat'l Sav. Bank*, 297 Md.

691, 712, 467 A.2d 758 (1983). Nor will speculation concerning the existence of unproduced evidence defeat the motion. *A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 262, 634 A.2d 1330 (1994). "[T]he mere existence of a scintilla of evidence … is insufficient to preclude the grant of summary judgment." *Beatty*, 330 Md. at 738, 625 A.2d 1005. Rather, the evidence offered to show a dispute of fact must be sufficiently detailed and precise to illuminate its nature. *Beatty*, 330 Md. at 737, 625 A.2d 1005; *see also Bond v. Nibco*, 96 Md.App. 127, 135, 623 A.2d 731 (1993); *Hill v. Lewis*, 21 Md.App. 121, 133–35, 318 A.2d 850, *cert. denied*, 272 Md. 724 (1974). Finally, even if the nonmoving party demonstrates the existence of a dispute of fact, the dispute will not defeat the motion for summary judgment unless the dispute concerns a *material* fact, *i.e.*, a fact that will alter the outcome of the case depending upon how the factfinder resolves the dispute over it. *King*, 303 Md. at 111, 492 A.2d 608; *Keesling v. State*, 288 Md. 579, 583, 420 A.2d 261 (1980); *Miller v. Fairchild*, 97 Md.App. 324, 340, 629 A.2d 1293, *cert. denied*, 333 Md. 172, 634 A.2d 46 (1993).

In our review, we accept as true that Bagwell hit Rivero in self-defense, reflexively, and not in retaliation. We also accept that Bagwell hit Rivero during the bite, rather than afterward. Nevertheless, we conclude that Peninsula produced evidence demonstrating that there was no dispute of material facts; Bagwell, on the other hand, failed to produce responsive evidence generating material factual disputes. We explain.

## II. Employment–Related Claims

### A. Breach of Contract

The parties agree that appellant was an at-will employee of Peninsula. Bagwell claims, however, that he was discharged in violation of the terms of Peninsula's Employee Handbook, which he argues created enforceable contractual rights. Appellant contends that the terms of the Employee Handbook limited Peninsula's ability to terminate its at-will employees, effectively modifying the at-will employment. Bagwell argues

that, because Peninsula was contractually bound to follow the terms of its own Handbook, the court erred in resolving the issue of whether Peninsula had breached certain provisions in the Handbook. Bagwell concedes, however, that if he actually had hit Rivero in a retaliatory manner after Rivero ceased biting, such conduct would constitute cause for immediate termination, based on the provisions in Peninsula's Employee Handbook concerning "mistreatment of a patient."

Preliminarily, we shall address the claim as against Tull, Koppenhaver, and Corrigan. Bagwell levelled his breach of contract claim against *all* appellees, without distinction. Yet in his various complaints, appellant recognizes that only Peninsula was Bagwell's employer. Bagwell presented no evidence below that he entered into an employment contract with Corrigan, Koppenhaver, or Tull personally. As there was no contract for Corrigan, Koppenhaver, or Tull to breach, these defendants were entitled to entry of judgment as a matter of law.

Generally, an employer or an employee may terminate an at-will employment relationship, for almost any reason or no reason, at any time. *Lee v. Denro,* 91 Md.App. 822, 829, 605 A.2d 1017 (1992); *Beery v. Md. Medical Laboratory,* 89 Md.App. 81, 94, 597 A.2d 516 (1991); *Haselrig v. Publ. Storage, Inc.,* 86 Md.App. 116, 122, 585 A.2d 294 (1991); *Castiglione v. Johns Hopkins Hosp.,* 69 Md.App. 325, 338, 517 A.2d 786 (1986); *see also Adler v. Amer. Standard Corp.,* 291 Md. 31, 35, 432 A.2d 464 (1981). One narrow exception to this doctrine, adopted in *Staggs v. Blue Cross of Md., Inc.,* 61 Md.App. 381, 486 A.2d 798 (1985), *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985), concerns situations in which the at-will employment relationship is modified by provisions in a personnel policy. Here, the Handbook provided, in pertinent part, as follows:

This Employee's Handbook provides some of the main features of our personnel policies and procedures which have been developed to assist each of us in carrying out the Hospital's task of providing the best possible patient care.

We hope that this will give you a good idea of the expectations of [Peninsula], as well as how many things are done at [Peninsula]. However, *the Handbook does not, and is not intended to, cover these materials in detail or serve as a contract between you and [Peninsula]. All statements are subject to change or modification without prior notice....*

* * * * * *

[Peninsula] will:

1. Provide fair employee relations, policies and practices as to wages, benefits, and working conditions; provide effective supervision and management in order to insure the continued success of [Peninsula].

* * * * * *

3. Require and assure that all levels of management will, through understanding supervision, apply all such policies and procedures fairly.

* * * * * *

It is the policy of the Hospital to provide an equitable, uniform and consistent procedure for administering corrective discipline for infractions of Hospital rules. Other than those instances that dictate immediate termination of employment, it should be clearly understood by both employee and supervisor that the purpose of discipline is to correct, not to punish.... When corrective discipline does not result in the necessary behavior change, termination of employment will occur.

When disciplinary action is taken, such action will be in writing.... The immediate Supervisor or Department Head shall be responsible for initiating corrective action in accordance with the following procedure:

A. One written warning will be given before suspension, except in circumstances listed in section C.

B. One written warning will be given before discharge, except in circumstances listed in section C.

 C. *Violation of the following may be cause for immediate dismissal without prior warning:*

\* \* \* \* \* \*

 4. Fighting, disorderly conduct, or the use of profane or abusive language on Hospital premises.

\* \* \* \* \* \*

 11. *Mistreatment of patients.*

(Emphasis added).

Appellant contends that the Handbook promises an opportunity to conform his conduct to Peninsula's expectations. Relying on *Staggs,* Bagwell claims that Peninsula breached the provisions of its Handbook by firing him without first either issuing him a written warning or taking some other disciplinary action short of discharge. We see no merit to this contention.

In *Staggs,* the appellants were at-will employees who had been discharged without having been given the benefit of the procedures specified in a company personnel memorandum. The memorandum stated specifically that an employee could be dismissed at any time *for cause,* and that multiple counselling sessions *would* precede final dismissal. 61 Md.App. at 384–85, 486 A.2d 798. We reversed the trial court's entry of summary judgment, holding that, under the circumstances, the at-will employment relationship had been so modified by the personnel policy as to require an exception to the at-will doctrine. *Id.,* at 388, 486 A.2d 798. We held that provisions in a policy memorandum

> that *limit the employer's discretion* to terminate an indefinite employment or that set forth a *required procedure for termination of such employment* may, if properly expressed and communicated to the employee, become contractual undertakings by the employer that are enforceable by the employee.

*Id.,* at 392, 486 A.2d 798 (emphasis added). At the same time, however, we explained that *not all* personnel policies and

employee handbooks create enforceable contractual rights. We said:

> Not every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant.... "General statements of policy are no more than that and do not meet the contractual requirements of an offer."

*Id.* (quoting *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626 (Minn.1983)).

We find the case of *Castiglione,* 69 Md.App. at 338–41, 517 A.2d 786, particularly instructive here. In *Castiglione,* the hospital's employee handbook specified that, before an employee would be discharged, the supervisor would review the employee's job performance with the employee. Although the plaintiff, an at-will employee, attended such an evaluation meeting, her supervisor did not there discuss the plaintiff's job performance before discharging her. She sued for breach of contract, arguing that the employee handbook required the employer to review the employee's record with the employee prior to termination. *Id.,* at 328–29, 517 A.2d 786. The trial court granted summary judgment based on a disclaimer in the manual that stated that the handbook did not constitute an express or implied contract. *Id.,* at 329, 517 A.2d 786. We affirmed. *Id.,* at 338, 517 A.2d 786. After reviewing *Staggs,* we said:

> The disclaimer language in the policy manual ... does not indicate any intent to limit the discretion of the appellee to discharge only for cause, as was the case in *Staggs....* Finally, unlike the situation in *Staggs,* in this case the appellee expressly negated, in a clear and conspicuous manner, any contract based upon the handbook for a definite term and reserved the right to discharge its employees at any time. The provisions for review, when viewed in the larger context, were but "general policy statements" not amounting to an offer of employment for a definite term or requiring cause for dismissal.

\* \* \* \* \* \*

> *The purpose of the* Staggs *exception to the at will doctrine is to protect the legitimate expectations of employees who have justifiably relied on manual provisions precluding job termination except for cause. Justifiable reliance is precluded where, as in the case at hand, contractual intent has been expressly disclaimed.*

*Id.,* at 339–41, 517 A.2d 786 (emphasis added; citation omitted). *See also Hrehorovich,* 93 Md.App. at 790–95, 614 A.2d 1021 (applying reasoning of *Castiglione* to disclaimer found in hospital by-laws, as well as in employee handbook); *Fournier v. U.S. Fidelity & Guaranty Co.,* 82 Md.App. 31, 41–43, 569 A.2d 1299 (1990) (applying reasoning of *Castiglione* to disclaimer found in an application for employment, rather than in an employee handbook).

As in *Castiglione,* Peninsula's Handbook contained a clear disclaimer. This disclaimer, like the one in *Castiglione,* expressly stated that the Handbook should not be treated as a contract in any way. Peninsula's Handbook also reserved the right to change any of the terms of the Handbook at any time, as well as the right to discharge any employee at any time. Consequently, Bagwell cannot reasonably assert justifiable reliance on any of the terms of the Handbook. Therefore, as Peninsula was entitled to terminate the relationship without complying with the terms of the Handbook, it was entitled to entry of judgment with respect to this claim.

### B. Wrongful Discharge

Bagwell contends that, even if the Employee Handbook did not limit Peninsula's ability to discharge him, his termination nevertheless constituted an abusive or wrongful discharge under *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981) and its progeny. As we have observed, with few exceptions, at-will employment is terminable by either party, at any time, for any reason whatsoever. *Adler,* 291 Md. at 35, 432 A.2d 464 (citing *St. Comm'n on Human Rel. v. Amecom Div.,* 278 Md. 120, 360 A.2d 1 (1976), *Vincent v. Palmer,* 179 Md. 365, 19 A.2d 183 (1941), and *W., B. & A.R.R.*

*Co. v. Moss,* 127 Md. 12, 96 A. 273 (1915)); *Denro,* 91 Md.App. at 829, 605 A.2d 1017. *See also Suburban Hosp. v. Dwiggins,* 324 Md. 294, 303, 596 A.2d 1069 (1991); *Hrehorovich v. Harbor Hospital,* 93 Md.App. at 784–85, 614 A.2d 1021; *Castiglione,* 69 Md.App. at 338, 517 A.2d 786. Nonetheless, the Court in *Adler* recognized a narrow exception to that rule; the discharge may not contravene a clear mandate of public policy. *Adler,* 291 Md. at 35, 432 A.2d 464. *See also Ewing v. Koppers Co., Inc.,* 312 Md. 45, 49, 537 A.2d 1173 (1988) (tort is also available to contractual employees); *Brandon v. Molesworth,* 104 Md.App. 167, 179–81, 655 A.2d 1292, *cert. granted,* 339 Md. 739, 664 A.2d 935 (Sept. 18, 1995) (discussion of wrongful discharge); *Denro,* 91 Md.App. at 829–30, 605 A.2d 1017 (discussing definition of clear mandate of public policy); *Townsend v. L.W.M. Mgmt., Inc.,* 64 Md.App. 55, 60–61, 494 A.2d 239, *cert. denied,* 304 Md. 300, 498 A.2d 1186 (1985) (same).

 The tort of wrongful or abusive discharge "is defined as the willful termination of employment by the employer because of the employee's alleged failure to perform in accordance with the employer's expectations and the termination is contrary to a clear mandate of public policy." *Allen v. Bethlehem Steel Corp.,* 76 Md.App. 642, 652, 547 A.2d 1105, *cert. denied,* 314 Md. 458, 550 A.2d 1168 (1988). "Specifically, in order to state a claim for wrongful discharge, the employee must demonstrate: (1) that the employee was discharged; (2) that the dismissal violated some clear mandate of public policy; and (3) that there is a nexus between the defendant and the decision to fire the employee." *Shapiro v. Massengill,* 105 Md.App. 743, 764, 661 A.2d 202 (1995) (citing *Leese v. Baltimore Co.,* 64 Md.App. 442, 468, 497 A.2d 159, *cert. denied,* 305 Md. 106, 501 A.2d 845 (1985)).

 To prevail, the employee must demonstrate the policy in question with clarity, specificity, and authority. " '[R]ecognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of the case,' a practice which should be

employed sparingly, if at all." *Lee v. Denro,* 91 Md.App. at 830, 605 A.2d 1017 (quoting *Adler,* 291 Md. at 45, 432 A.2d 464).

Bagwell contends that his discharge contravened two clear mandates of public policy: first, his duties as a security officer; second, his right to defend himself. As in *Denro,* "[t]his case presents the 'familiar common-law problem of deciding where and how to draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not." *Id.* at 828, 605 A.2d 1017 (citing *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385, 387 (1980)). Here, the line must be drawn in favor of the employer.

We turn first to appellant's claim that derives from his position as a "Special Commissioned Police Officer." As a Special Police Officer, appellant was officially commissioned by the Governor, pursuant to Md.Ann.Code of 1957, Art. 41 §§ 4–901 through 4–913 (1992), to protect Peninsula. Under § 4–905, a Special Police Officer "is charged with the protection and preservation of peace and good order on the property [that the officer was hired to protect]," with all the powers vested in any other police officer to protect the employer's property. *See, e.g., Waters v. State,* 320 Md. 52, 575 A.2d 1244, *cert. denied* 498 U.S. 989, 111 S.Ct. 529, 112 L.Ed.2d 539 (1990); *Huger v. State,* 285 Md. 347, 352, 402 A.2d 880 (1979). Bagwell asserts that, under Art. 41 § 4–905, he had a duty to protect the safety of Peninsula's personnel and property. He further argues that society has an interest in ensuring that all police officers, including Special Police Officers, are allowed to fulfill their official duties without fear of termination for doing so.

Appellant relies for support on *Bleich v. Florence Crittenton Svces. of Baltimore, Inc.,* 98 Md.App. 123, 135–37, 632 A.2d 463 (1993). In *Bleich,* the employee was obligated, pursuant to a comprehensive statutory and regulatory scheme, to report all instances of suspected child abuse or neglect. This scheme

specifically included an express declaration that the policy of the scheme was " 'to protect minor children whose care has been relinquished to others by the children's parent.' " *Id.*, at 135–36, 632 A.2d 463 (quoting Md.Code Ann., Fam.Law Art. § 5–502(b) (1991)). The employee made such a report, and after she was fired, she filed suit alleging wrongful discharge. For the purposes of determining whether the employee had stated a claim, the parties assumed that the employee was discharged in retaliation for having obeyed the duty imposed by the statutory scheme. We concluded that firing the employee for obeying her duty would violate the express statutory policy. *Id.*, at 138–40, 632 A.2d 463.

█ We decline Bagwell's request to find that Art. 41 § 4–905 constitutes a clear mandate of public policy. "[J]urists to this day have been unable to fashion a truly workable definition of public policy." *Md. Nat'l Cap. P. & P. Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 605, 386 A.2d 1216 (1978). Nevertheless, "unless deducible in the given circumstances from constitutional or statutory provisions, [public policy] should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection." *Townsend v. L.W.M. Mgmt., Inc.*, 64 Md.App. at 61–62, 494 A.2d 239 (quoting *Patton v. United States*, 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930)).

Unlike the plaintiff in *Bleich*, Bagwell cannot point to any declaration of policy in the statute on which he can rely. Rather, he relies on his status as a Special Police Officer, with statutorily delineated duties. We are not convinced that the particular policy claimed by appellant—that society has an interest in ensuring that all police officers are allowed to fulfill their official duties—is embodied in § 4–905; it merely states that a Special Police Officer has the duty to protect the peace and order on the property he was appointed to protect. Moreover, we have never held that every statute constitutes a clear mandate of public policy for purposes of the tort of wrongful discharge. Indeed, were we to so hold, we would open the floodgates of litigation.

Although not a wrongful discharge case, we find the Court's comments in *Md.–Nat'l Cap. P. & P.* particularly persuasive:

> Fearing the disruptive effect that invocation of the highly elusive public policy principle would likely exert on the stability of commercial and contractual relations, Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds, doing so only in those cases where the challenged agreement is patently offensive to the public good.... This reluctance on the part of the judiciary to nullify contractual arrangements on public policy grounds also serves to protect the public interest in having individuals exercise broad powers to structure their own affairs by making legally enforceable promises a concept which lies at the heart of the freedom of contract principle.

*Id.,* 282 Md. at 606, 386 A.2d 1216 (citations omitted).

Assuming, *arguendo,* that the statutory section cited by appellant expresses a "clear mandate of public policy," Bagwell must nonetheless demonstrate a "nexus" between the discharge and the policy, *i.e.,* that the specific *basis* for his discharge violates the policy in issue. Bagwell has failed to generate any evidence with respect to a subtle but key factual issue: whether the reason Peninsula fired him was for *carrying out his duty.* Appellees assert that Bagwell was fired for allegedly *breaching his duty,* by striking a patient for retaliatory purposes. In contrast, Bagwell has alleged only that he *was* performing his duty (which, based on the posture of the case, we must assume is true). Bagwell relies primarily on the coincidental event of his termination to argue that he was fired as a result of the performance of his duty. In order to establish the requisite nexus between the discharge and the alleged policy, Bagwell must assert more than a mere allegation that appellees discharged him *because* he was executing his duty.

Appellant thus claims that appellees, frightened about the prospect of a lawsuit by Rivero, discharged Bagwell to enhance Peninsula's position in the event of a lawsuit. The problem with this argument becomes apparent simply by its

presentation; the decision to fire Bagwell had nothing to do with his compliance with or breach of his statutory duties. Consequently, it is undisputed that the reason why Bagwell was discharged was not a *wrongful* one. *Townsend,* 64 Md. App. at 69–70, 494 A.2d 239. What we said in *Beery* crystallizes our point:

> Had [the employee] been guilty of the alleged misconduct, it would have been entirely proper and appropriate for the employer to fire [him]. *Firing [him] on the basis of . . . unsubstantiated allegations, without proof and, indeed, without fully investigating the matter, may very well have been improper—even foolish—but can hardly be said to contravene any clear mandate of public policy.*

89 Md.App. at 94–95, 597 A.2d 516 (emphasis added).

*Townsend v. L.W.M. Mgmt., Inc.,* 64 Md.App. 55, 494 A.2d 239, is also instructive. The employer required several employees to submit to a polygraph test in order to determine whether any of them was guilty of stealing from the employer. One of the employees agreed to take the test, but failed it. Following his discharge, the employee filed suit for wrongful discharge, but the circuit court granted a directed verdict in favor of the employer. On appeal, we agreed with the employee that, under Maryland law, there was a clear mandate of public policy prohibiting employers from forcing employees to submit to polygraph tests. Nonetheless, we affirmed the judgment because the employer fired the employee *for stealing,* and not based on whether the employee consented or refused to take the polygraph test. *Id.,* at 69–70, 494 A.2d 239. We concluded that the mere reliance on the *results* of the polygraph test, even if the employer had wrongfully required the employee to take the test, did not violate the public policy. *Id.,* at 70, 494 A.2d 239. *See also Brandon,* 104 Md.App. at 194, 655 A.2d 1292 ("Even if some unlawful animus contributed to the ultimate employment decision, liability does not necessarily attach," particularly where the decision would have been the same with or without the animus).

Even assuming Peninsula was incorrect about whether Bagwell hit the patient in retaliation, appellant did not provide any evidence disputing that appellees truly believed Bagwell had acted in retaliation. Appellees may have been wrong about the facts, and they may have hoped to improve their position in the event of a lawsuit. But they were entitled to terminate an at-will employee, like Bagwell, based on valid economic concerns or even for foolish reasons. As we said in *Shapiro:*

> The question is not whether discharging [the employee for his arguably improper conduct] was fair, justified, sensible, reasonable, or appropriate. Rather, the question is whether it was *wrongful, i.e.,* whether it violated a clear mandate of public policy. Absent that type of violation, employers can discharge at-will employees for no reason or even for a bad reason.

> What appellant overlooks ... is the fact that mere termination of employment does not give rise to a cause of action for [wrongful] discharge. [If appellant] was an 'at-will' employee, appellee had an absolute right to fire [him] for *no* reason or for *almost any* reason without incurring any liability for doing so.

*Id.,* 105 Md.App. at 769, 661 A.2d 202 (quoting *Beery v. Md. Medical Laboratory, Inc.,* 89 Md.App. 81, 94, 597 A.2d 516 (1991), *cert. denied,* 325 Md. 329, 600 A.2d 850 (1992)) (emphases in original opinions). *See also Lee v. Denro,* 91 Md. App. at 836, 605 A.2d 1017 ("[T]he fact that the employer does not have a good reason for the employee's discharge does not, in the absence of a clear violation of public policy, render the discharge 'abusive' or 'wrongful.' ").

██ Appellant fares no better with respect to his claim of self-defense as another "clear mandate of public policy." To support his claim that Maryland recognizes a clear mandate of public policy with respect to self-defense, Bagwell relies on *Watson v. Peoples Security Life Ins. Co.,* 322 Md. 467, 588 A.2d 760 (1991). In *Watson,* the employee was discharged for suing a co-worker for assault and battery. The Court held that a person's right to seek legal redress for actionable torts

represents a clear mandate of public policy sufficient to satisfy *Adler. Id.*, at 480–81, 483, 588 A.2d 760. But the Court never considered whether the right to act violently, even in self-defense, is protected by a clear mandate of public policy. Thus, the case does not support appellant's proposition. We therefore decline to conclude that conduct in self-defense is protected by a clear mandate of public policy.

Although it appears that Maryland has not considered the question of whether acting in self-defense constitutes a clear mandate of public policy, at least one other state has considered it. In *McLaughlin v. Barclays American Corp.*, 95 N.C.App. 301, 382 S.E.2d 836, *cert. denied,* 325 N.C. 546, 385 S.E.2d 498 (1989), the discharged employee in question was the supervisor of a disruptive employee. The supervisor was blamed for an altercation with the subordinate and was fired. In a wrongful discharge suit, the employee asked the court to find "a public-policy exception to the employee-at-will doctrine, and to recognize a cause of action for wrongful discharge when the termination results from the employee's use of self-defense." *Id.* at 382 S.E.2d at 839. The Court of Appeals of North Carolina, accepting the employee's assertion that he acted in self-defense, nevertheless held that his termination did not constitute wrongful discharge because "acting in self-defense" is not protected by public policy. *Id.*, 382 S.E.2d at 838. According to the court, "public policy," which bars a citizen from doing "that which has a tendency to be injurious to the public or against the public good," *Id.*, was not implicated by the employer's conduct. What that court said is pertinent here:

> [P]ublic-policy implications are not present in [the employee's] case. We do not perceive the kind of deleterious consequences for the general public, if we uphold [the employers'] action. . . .

> [The employers'] investigation of the . . . incident was shallow and perfunctory, and their dismissal of Mr. McLaughlin, who had no culpability for the altercation, was irrational. We cannot say, however, that the defendants' actions amounted to bad faith. . . . The conduct of defen-

dants in this case, in its worst light indifferent and illogical, does not demonstrate the kind of bad faith that prompted our courts to recognize causes of action [for wrongful discharge]....

... Nor are we unmindful that the at-will doctrine may work to place employees in catch–22 dilemmas of choosing between their physical defense and their continued employment. It might be true, moreover, that defendants in this case could legally have discharged Mr. McLaughlin had he made *no* effort to defend himself during the altercation. Mr. McLaughlin's argument, therefore, that our public policy favors encouraging employees to defend themselves is not convincing....

Were we to recognize a cause of action in this case, every employee involved in an altercation would assert a self-defense justification, spawning the very deluge warned against by the Court in *Coman [v. Thomas Mfg. Co., Inc.,* 325 N.C. 172, 381 S.E.2d 445 (1989) ].

*Id.,* 382 S.E.2d at 839–40 (citation omitted; emphasis in original).

■■■ Even if the right to strike another in self-defense constitutes a clear mandate of public policy, appellees are nonetheless entitled to judgment. Bagwell failed to present any evidence that the *reason* he was fired was because he acted in self-defense.[6] To the contrary, *all* the evidence points to the conclusion that the reason Peninsula fired Bagwell was because appellees believed he acted in retaliation, and *not* in self-defense.

### C. *Intentional Interference with Contractual Relations*

■■■ Appellant's claim regarding the tort of "intentional interference with contractual relations" is without merit. In-

---

6. Bagwell asserted, in his opposition to the motion for summary judgment, that Tull was heard by a group of nurses as saying "Bagwell will get what he deserves." Appellant presented no evidence to support this allegation, and has not presented evidence of any other comments by anyone that would support Bagwell's assertion that he was fired for acting in self defense.

tentional interference with contractual relations is defined as follows:

"(1) The existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom."

*Storch v. Ricker,* 57 Md.App. 683, 703, 471 A.2d 1079 (1984) (quoting J. Dooley, 3 *Modern Tort Law* § 44.03 (1977) and citing *Restatement (2d) Torts* § 766 (1979)).

■ As a matter of law, a party to a contract cannot tortiously "interfere" with his or her own contract; the party can, at most, breach it. *Natural Design, Inc. v. The Rouse Co.,* 302 Md. 47, 71, 485 A.2d 663 (1984); *Wilmington Trust Co. v. Clark,* 289 Md. 313, 329–30, 424 A.2d 744 (1981); *Bleich v. Florence Crittenton Serv. of Baltimore,* 98 Md.App. 123, 146, 632 A.2d 463 (1993). Neither can an agent of the party to a contract, acting within the scope of the agency, "interfere" with the contract. *Natural Design,* 302 Md. at 71, 485 A.2d 663; *see also Continental Casualty Co. v. Mirabile,* 52 Md. App. 387, 402, 449 A.2d 1176 (1982).

Bagwell has not alleged, however, that Tull, Koppenhaver, or Corrigan were acting outside the scope of their employment. Moreover, as we have already discussed, Bagwell has not demonstrated that anyone *breached* a contract; appellees were entitled to terminate the employment relationship in their discretion. Consequently, appellees were entitled to entry of judgment on this count.

*D. Intentional Interference with Prospective Advantage*

■ In his various complaints, Bagwell included a claim for "intentional interference with prospective relationships," along with his claim for "intentional interference with contractual relations," premised on appellees' disclosure of

information to OCPD and WCDOC. This tort, commonly called either "intentional interference with prospective advantage" or "intentional interference with business relationships," lies where the wrongful conduct of the defendant interferes with the plaintiff's existing or anticipated economic relationships, notwithstanding the absence of a breach of contract. *Alexander,* 336 Md. at 650–51, 650 A.2d 260; *Ellett,* 66 Md. App. at 707, 505 A.2d 888 (citing R.P. Gilbert et al., *Maryland Tort Law Handbook,* § 6.6 (1986)). It has the following elements:

> "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."

*Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.,* 336 Md. 635, 652, 650 A.2d 260 (1994) (quoting *Willner v. Silverman,* 109 Md. 341, 355, 71 A. 962 (1909)); citing *K & K Mgmt. v. Lee,* 316 Md. 137, 160, 557 A.2d 965 (1989) and *Natural Design,* 302 Md. at 69–70, 485 A.2d 663. *See also Macklin v. Logan,* 334 Md. 287, 302, 639 A.2d 112 (1994) (distinguishing "interference with contractual relations" from "interference with business relations"); *Bleich,* 98 Md.App. at 146–47 & n. 5, 632 A.2d 463 (overlap of "interference with contractual relations" and "interference with business relations"); *Ellett v. Giant Food, Inc.,* 66 Md.App. 695, 707, 505 A.2d 888 (1986) (discussion of tort); W. Keeton et al., *Prosser and Keeton on Torts,* § 130 (5th ed. 1984) (hereinafter *"Prosser & Keeton"*) (discussion of tort); *Restatement (2d) Torts* § 766B (1982).

As noted, the tort of intentional interference with business relations requires that the tortious act in question be "without right or justifiable cause on the part of the defendant." *Alexander & Alexander,* 336 Md. at 652, 650 A.2d 260. What constitutes "unlawful purpose" or absence of justification is ordinarily a fact-specific inquiry. *Natural Design,* 302 Md.

at 71–72, 485 A.2d 663. Based on the record here, however, we see no basis for concluding that appellees lacked justification for providing OCPD and WCDOC the information that was in Peninsula's file on Bagwell, because OCPD and WCDOC specifically *requested* such information and appellant *consented* to the release. *Cf. Storch,* 57 Md.App. at 704, 471 A.2d 1079 (in context of intentional interference with contract, simply giving information in response to proper request for it, even if harmful to plaintiff, is not actionable); *McDermott v. Hughley,* 317 Md. 12, 27, 561 A.2d 1038 (1989) (consent is absolute defense to defamation).

The OCPD consent form executed by appellant stated, in pertinent part, as follows:

> I also authorize and request every person, firm, company, corporation, governmental agency, court, association or institution having control of any documents, records, and other information pertaining to me, to furnish the Ocean City Police Department any such information, *including all documents, medical records, and other criminal records or files regarding charges or complaints filed against me, formal, pending or closed, or any other pertinent data,* to permit the Ocean City Police Department or its agents or representatives to inspect and make copies of such documents, records, and other information.

> I hereby *release, discharge, exonerate* the Ocean City Police Department ... and *any person so furnishing information from any and all liability of every nature and kind arising out of the furnishing or inspection of such documents, records, and other information* ....

(Emphasis added). The form provided by WCDOC, which appellant also signed, stated in pertinent part as follows:

> The intent of this authorization is to give my consent for *full and complete disclosure of the records of* ... *employment and pre-employment records, including background reports, efficiency ratings, [and] complaints or grivances* [sic] *filed by or against me* ....

I reiterate, and emphasize that the intent of this authorization is to provide full and free access to the background and history of my personal life. . . . It is my specific intent *to provide access to personal information and to release copies and abstracts* however personal or confidential they may appear to be . . .

 \* \* \* \* \* \*

*I agree to indemnify and hold harmless the person to whom this request is presented and his agents and employees, from and against all claims, damages, losses and expenses, including reasonable attorney's fees, arising out of or by reason of complying with this request.*

(Emphasis added).

Given that Bagwell consented to appellees' disclosure of Bagwell's employment files to OCPD and WCDOC, appellant cannot establish a prima facie case. Consequently, we are of the view that the trial court properly granted summary judgment on this count.

 Bagwell also asserts that appellees were aware of Bagwell's acquittal, prior to giving any character references, and that they knew the acquittal "vindicated" his version of events and "exonerated" him of criminal wrongdoing. Consequently, he concludes (without authority) that appellees' knowledge of the acquittal, as a matter of law, vitiated any justification appellees may have had to inform OCPD or WCDOC that Bagwell was fired because he mistreated a patient. Again, we disagree.

Preliminarily, we note that, in a criminal case, an acquittal means that the evidence presented was not sufficient to convince the factfinder, beyond a reasonable doubt, of the defendant's guilt. Nevertheless, a defendant found not guilty of committing a criminal act may still be held liable for that same act in a related civil case, because of the lesser quantum of proof. *Cf.* JOHN W. STRONG, *ET AL.,* 2 McCORMICK ON EVIDENCE § 298, at 298–99 (4th ed.1992) (unlike conviction, judgment of acquittal is barred by hearsay rule because it does not consti-

tute a finding of innocence). Thus, the mere fact that Bagwell was exonerated criminally does not mean that he would have been found not liable in a civil proceeding or that appellees were legally bound to *believe* Bagwell acted in self-defense.

Moreover, Bagwell has not alleged that appellees gave OCPD and WCDOC anything that was not in Peninsula's file regarding Bagwell, or that appellees told either OCPD or WCDOC anything other than the reason why Bagwell was fired.[7] In addition, appellant did not present any evidence that appellees otherwise harbored ill will or spite. *See Natural Design*, 302 Md. at 72, 485 A.2d 663 (citing *Willner v. Silverman*, 109 Md. 341, 354, 71 A. 962 (1909), holding that ill will or spite sometimes satisfies unlawful purpose element). All Bagwell showed is that appellees gave a character reference that appellant considered unfavorable. He has presented no authority in support of his claim that giving an unfavorable character reference to a prospective employer, which contains or is based on false or inaccurate information, constitutes intentional interference with prospective employment relationships.

## III. Defamation and Related Claims [8]

### A. *Libel and Slander*

 Bagwell alleges various instances of libel and slander. With respect to his claim of libel, he refers to Peninsula's

---

7. Although it is not entirely clear from the record, both OCPD and WCDOC were probably aware of Bagwell's acquittal and, as a consequence, were well situated to evaluate the circumstances of his termination from Peninsula.

8. For organizational purposes, we have placed our discussion of "false light" in this section. Although the tort of "publicity placing a person in a false light" is a form of invasion of privacy, the facts underlying both Bagwell's defamation and false light claims are essentially identical. In addition, the principles governing defamation and false light significantly overlap. *See, e.g., Steer v. Lexleon, Inc.*, 58 Md.App. 199, 472 A.2d 1021 (1984) (issue of privilege applies to both defamation and false light actions); *Restatement (2d) Torts* § 652E Comment b, at 395 (relation between false light and defamation actions); *Id.*, Comment c, at 399 (application of defamation rules to false light actions); *Id.*,

written statements to DEED, OCPD, and WCDOC. Concerning his claim of slander, he complains about two groups of disclosures: First, on July 17 and 18, 1992, Tull spoke to Bagwell's former coworkers concerning his termination and, on each date, Tull falsely stated that Bagwell physically abused a restrained patient. Second, in late July, 1992, Donna Richardson, spokesperson for Peninsula, told a reporter for a local newspaper that Bagwell had been terminated and that Peninsula had apologized to the Rivero family.

At the outset, appellees' assertion that the defamation claims are barred by the statute of limitations, however substantively meritorious, must fail. Under Md.Code Ann., Cts. & Jud.Proc. Art. § 5–105 (1989 & Supp.1992), all libel and slander claims must be filed within one year of the date on which the damaging statements were improperly communicated.[9] Under Rule 2–323(g), the statute of limitations is an affirmative defense that must be included in the answer. But appellees failed to plead the statute of limitations in any of their answers to Bagwell's various complaints. Appellees' failure to include this defense in their answers constitutes a waiver of the issue. *Brooks v. State*, 85 Md.App. 355, 584 A.2d 82 (1991).

Nonetheless, appellees were entitled to judgment. To the extent the libel claim is predicated on the written statements and upon the release of documents to OCPD and WCDOC, appellant cannot prevail. As we noted earlier, Bag-

---

§ 652G (conditional privileges of defamation apply to false light actions). *But see Prosser & Keeton* § 117, at 864 (one major distinction is that defamation action protects a party's interest in a good reputation while false light protects interest in being let alone from adverse publicity).

9. Peninsula's communication to DEED occurred on August 10, 1992; its communication with the newspaper occurred some time in July 1992; Tull's alleged communications with Bagwell's former co-workers occurred on July 17 and 18, 1992; and Richardson spoke to the press in July 1992. Appellant, however, did not file his complaint until September 2, 1993. Consequently, none of these communications provides a basis for a viable defamation action.

well executed two comprehensive consent forms, releasing from liability anyone giving prior employment information to OCPD and WCDOC. Consent is an absolute defense to defamation. *McDermott v. Hughley,* 317 Md. 12, 27, 561 A.2d 1038 (1989).

> "It is not necessary that the [defamed party] know that the matter to the publication of which he consents is defamatory in character. It is enough that he knows the . . . language of the publication or that he has reason to know that it may be defamatory." . . . One who invites the publication knowing that its contents may damage his reputation cannot complain when his fears come true.

*Id.* (quoting *Restatement (2d) Torts* § 583, Comment d).

Bagwell, aware that Peninsula's employment file contained a copy of the "pink slip," and believing that he was unjustly fired, cannot reasonably assert that he did not realize that the information contained in Penninsula's file was unfavorable. Moreover, appellant failed to demonstrate that the forms did not extend to the release of *any* information, including information wholly subjective and pertaining to the employer's perceptions of disputed events. Nor did Bagwell produce any evidence that the information provided by Peninsula to each prospective employer was not in its file on Bagwell's employment. Thus, these forms constitute a consent to Peninsula's release of the information contained in the file.

Bagwell asserts, however, that the release forms extend only to the physical transfer of any documents in the file, and not to any oral commentary, even if co-extensive with the information in the file. Significantly, however, Bagwell failed to produce any evidence rebutting Peninsula's assertion that its oral comments did not include any information not contained in Bagwell's employment file. And, as is apparent from the emphasized portions of the release forms quoted above, the forms did not expressly limit their applicability to the physical transfer of paper documents. Rather, they applied to *any* dissemination of employment information. Consequently, Bagwell cannot prevail in his defamation claims based on

Peninsula's compliance with the two requests, whether by reference to the documents in his file or to any oral comments made on the basis of those documents.

■ We can also dispose of one of Bagwell's slander claims, based on a failure of proof. With respect to Tull's alleged statements, Tull denied under oath having made them. In response, notwithstanding the pages of deposition testimony Bagwell offered in opposition to the summary judgment motion, Bagwell failed to offer any evidence to support his assertion that Tull ever told anyone about Bagwell's discharge. All of the deponents averred that they learned of Bagwell's termination through the "rumor mill," and they all specifically denied hearing about it from Tull.

■ With respect to Richardson's statement to the press, it obviously was not false. *Chesapeake Publishing Corp. v. Williams,* 339 Md. 285, 296, 661 A.2d 1169 (1995) (quoting *Batson,* 325 Md. at 726, 602 A.2d 1191, "[a] false statement is one that is not substantially correct. . . . Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' "). Consequently, this statement cannot support an action for defamation. *Kairys v. Douglas Stereo Inc.,* 83 Md.App. 667, 678, 577 A.2d 386 (1990) (as the falsity of the statement is an element in any defamation action that must be proven by the plaintiff, true statements cannot be defamatory).

Assuming the consent forms did not apply to the communications in question, and assuming further that Tull actually uttered the alleged defamatory statements, appellees would still prevail on the defamation counts on the basis of a qualified privilege. We explain.

■ In a defamation case involving a plaintiff who is not a public figure, a prima facie case requires proof of the following elements:

(1) that the defendant made a defamatory communication— i.e., that he communicated a statement tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule to

a third person who reasonably recognized the statement as being defamatory; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm.

*Kairys,* 83 Md.App. at 678, 577 A.2d 386 (citing *Hearst Corp. v. Hughes,* 297 Md. 112, 466 A.2d 486 (1983) and *Gooch v. Md. Mechanical Systems, Inc.,* 81 Md.App. 376, 567 A.2d 954, *cert. denied,* 319 Md. 484, 573 A.2d 807 (1990)). "Fault," for the purposes of the prima facie case, may be based either on negligence or constitutional malice. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Batson v. Shiflett,* 325 Md. 684, 728, 602 A.2d 1191 (1992); *Hearst Corp.,* 297 at 122, 466 A.2d 486 (citing *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976)). *See also Restatement (2d) Torts* § 580B (1975) (fault standard for defamation of a private person).

The communication to DEED was subject to a qualified privilege provided by statute. Md.Code Ann., Lab. & Emp't Art., § 8–105 (1992). *See also Gay v. William Hill Manor, Inc.,* 74 Md.App. 51, 56, 536 A.2d 690 (1988) (involving predecessor statute). The alleged oral communications to employees were protected by the common law privilege extending to communications between an employer and an employee. *See, e.g., McDermott,* 317 Md. at 28–29, 561 A.2d 1038; *Exxon Corp.,* 67 Md.App. at 421, 508 A.2d 142 (citing cases); *Happy 40, Inc. v. Miller,* 63 Md.App. 24, 35, 491 A.2d 1210, *cert. denied,* 304 Md. 299, 498 A.2d 1185 (1985) (same). Finally, the statements to OCPD and WCDOC are protected by a qualified privilege, extending to an employee character reference given by a former employer to a prospective employer. *See Sindorf v. Jacron Sales Co., Inc.,* 27 Md.App. 53, 341 A.2d 856 (1975), *aff'd,* 276 Md. 580, 350 A.2d 688 (1976).

When a statement enjoys a qualified privilege, the privilege defeats an action for defamation.[10] *Jacron,* 276 Md.

---

**10.** Bagwell raises, for the first time on appeal, the doctrine of "compelled self-publication," by which a party can be held liable, notwith-

**512**

at 598, 350 A.2d 688. The question of whether a defamatory communication enjoys a qualified privilege is a matter of law for the court. *Exxon Corp. v. Schoene,* 67 Md.App. 412, 421, 508 A.2d 142 (1986) (citing *Jacron,* 276 Md. at 600, 350 A.2d 688)). But the question of whether the defendant abused the privilege ordinarily is an issue for the jury to decide. *Id.; Happy 40,* 63 Md.App. at 34, 491 A.2d 1210. When the evidence in the record demonstrates that the defendant had a reasonable basis for believing the truth of the statement and there is no evidence impeaching the defendant's good faith, the court must enter judgment against the plaintiff. *Stack,* 293 Md. at 540, 445 A.2d 1038.

A qualified privilege may be overcome only if the plaintiff can prove either that the defendant acted with constitutional malice, that the statement was not made in furtherance of the reason for the privilege, or was communicated to a third person who is outside the protection of the privilege. *Leese,* 64 Md.App. at 476, 497 A.2d 159. *See also, Caldor, Inc. v. Bowden,* 330 Md. 632, 654–55, 625 A.2d 959 (1993); *McDermott,* 317 Md. at 29–30, 561 A.2d 1038; *Marchesi v. Franchino,* 283 Md. 131, 139, 387 A.2d 1129 (1978); *Happy 40, Inc.,* 63 Md.App. at 31–32, 491 A.2d 1210. Constitutional malice, which is sometimes referred to as actual malice, *Batson,* 325 Md. at 728, 602 A.2d 1191, is established where the plaintiff shows that the defendant published the statement in issue either with reckless disregard for its truth or with actual knowledge of its falsity. *Id.*

"Actual malice" cannot be established merely by showing that: the publication was erroneous, derogatory or untrue;

---

standing any privilege, for a defamatory statement that is subsequently published to a third party, so long as "the originator [of the defamatory statement] knows, or should know, of circumstances whereby the defamed person has no reasonable means of avoiding the resulting damages." *Lewis v. Equitable Life Assurance Society,* 389 N.W.2d 876, 887 (Minn.1986). According to appellant, although this emerging doctrine has not been considered by any Maryland court, it has been accepted by ten states. We decline to reach this issue, as it was not raised below. Md.Rule 8–131(a).

the publisher acted out of ill will, hatred or a desire to injure ...; the publisher acted negligently; the publisher acted in reliance on the unverified statement of a third party without personal knowledge of the subject matter of the defamatory subject; *or the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person.* Moreover, *malice is not established if there is evidence to show that the publisher acted on a reasonable belief that the defamatory material was* " *'substantially correct'* " *and* "*there was no evidence to impeach the [publisher's] good faith,*" *New York Times Co. [v. Sullivan],* 376 U.S. [254,] at 286, 84 S.Ct. [710,] at 729 [, 11 L.Ed.2d 686].

*Capital–Gazette Newspapers, Inc. v. Stack,* 293 Md. 528, 539–40, 445 A.2d 1038 (1982) (emphasis added; other citations omitted).

██ Based on the undisputed facts that we reviewed, at length, appellees had a reasonable basis for concluding that Bagwell did not strike Rivero in self-defense. Appellant presented no evidence that appellees knew or should have known that the witnesses' statements were false. Nor did he provide any other reason why a reasonable factfinder might conclude that appellees had reason to distrust the accuracy of the witnesses' statements. Consequently, appellant did not present sufficient evidence in opposition to the motion for summary judgment to defeat the qualified privilege enjoyed by Peninsula and its agents.

## B. Invasion of Privacy/False Light

Bagwell also claimed an invasion of privacy by having been placed in "a false light." The tort of "publicity placing a person in a false light" is defined under *Restatement (2d) Torts* as follows:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

> (a) the false light in which the other person was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Id.* § 652E. *See also Beane v. McMullen*, 265 Md. 585, 600, 291 A.2d 37 (1972) (adopting predecessor to § 652E as definition).

▮▮▮▮▮ As this definition demonstrates, a defendant in a false light case is entitled to judgment as a matter of law, as in defamation claims, where the statement is true. *See also Restatement (2d) Torts* § 652E, Comment a, at 395 ("[I]t is essential to the rule stated in this Section that the matter published concerning the plaintiff is not true."). Moreover, the defendant is entitled to judgment where the plaintiff consented to the publication of the statement, *Prosser & Keeton* § 117, at 867 (consent is absolute defense because, where plaintiff consented, publicity cannot be offensive to the reasonable person); *cf. McDermott*, 317 Md. at 27, 561 A.2d 1038 (adopting "wisdom" of *Restatement (2d) Torts* on consent), or where the statement is protected by a qualified privilege, *Steer v. Lexleon, Inc.*, 58 Md.App. 199, 472 A.2d 1021 (1984) (privilege discussion applied identically to defamation and false light claims).

Based on the same reasoning in the analogous discussions with respect to defamation, appellees were entitled to entry of summary judgment with respect to the false light claim. Also, to the extent appellant failed to prove that Tull made the alleged statements to co-workers concerning Bagwell's discharge, appellees were entitled to judgment.

## IV. Miscellaneous Claims

### A. Intentional Infliction of Emotional Distress

▮▮▮ The tort of intentional infliction of emotional distress is rarely viable, and is "to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326

Md. 663, 670, 607 A.2d 8 (1992) (citing *Batson*, 325 Md. at 734–35, 602 A.2d 1191).

> The general rule that emerges from caselaw
>> is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. The requirements of the rule are rigorous, and difficult to satisfy.

*Id.* (quoting *Prosser & Keeton* § 12, pp. 60–61). *See also Hrehorovich*, 93 Md.App. at 799, 614 A.2d 1021 ("Maryland courts have limited recovery to the most extreme and unusual circumstances.").

 In the instant case, appellant has provided no basis upon which any reasonable factfinder could conclude that appellees' conduct, even in the light most favorable to Bagwell, was so extreme and outrageous that it went beyond all bounds "usually tolerated by decent society." *Kentucky Fried Chicken*, 326 Md. at 670, 607 A.2d 8. Indeed, the case of *Kentucky Fried Chicken* is particularly instructive on this point. There, after the employee confronted her supervisor over the supervisor's wrongful conduct, the supervisor began harassing the employee, accused her without basis of a theft that many people (including the supervisor) could have perpetrated, forced her to take a polygraph test, publicly suspended her without pay, and ultimately demoted her for unspecified reasons. The employee was hospitalized for six weeks for psychiatric treatment and never returned to work. After a jury verdict in favor of the employee, the trial court granted judgment notwithstanding the verdict. On appeal, the Court of Appeals affirmed. The Court said:

> When considering the [tort] now before us . . . we keep in mind that the basic issue is the behavior of the defendant. Was it indeed abominable? One author noted that "the tort, despite its apparent abundance of elements, in practice tends to reduce to a single element—the outrageousness of the defendant's conduct." He further stated:
>> The extraordinary feature of the tort . . . is its insistence upon "extreme and outrageous conduct." In fact,

this element is, in large respect, the entire tort. It both limits the reach of the tort and dominates the proof of its elements. The outrageousness requirement means there is no liability simply for the intentional infliction of emotional distress. If a defendant intends to cause a plaintiff emotional distress and succeeds in doing so, the defendant is nonetheless *not* liable unless his or her conduct is also extreme and outrageous. While intending to inflict emotional distress on another (particularly a person whose susceptibility is known to the defendant) is often outrageous, it need not be.

*Id.,* at 670–71, 607 A.2d 8 (emphasis in original; citation to law review omitted).

The Court assumed that the employer and the supervisor knew that the employee was in a delicate emotional state, and thus particularly susceptible to abuse. The Court also acknowledged that, in some situations, the defendant's abuse of a superior position in an employment relationship is a factor in determining outrageousness. *Id.,* at 678, 607 A.2d 8. Even so, based on the evidence adduced, the Court agreed with the trial court's entry of judgment in favor of the employer and supervisor. The Court commented:

The workplace is not always a tranquil world where civility reigns. Personality conflicts and angst over disciplinary actions can be expected. Even a certain amount of arbitrary nastiness may be encountered at all levels and in all occupations; this is a fact of life we must accept as readily as we recognize that employers and employees on the job interact differently than do friends at a summer picnic. If anxiety from management decisions were "deemed so severe that no reasonable person could be expected to endure it, nearly all employees would have a cause of action for intentional infliction of severe emotional distress."

*Id.,* at 679, 607 A.2d 8 (citation omitted).

Here, appellees' conduct, which was not comparable to the conduct described in *Kentucky Fried Chicken,* simply cannot

be considered " 'atrocious' or 'utterly intolerable in a civilized community.' " *Hrehorovich,* 93 Md.App. at 800, 614 A.2d 1021 (quoting *Harris v. Jones,* 281 Md. 560, 567, 380 A.2d 611 (1977)). Appellees fired Bagwell, perhaps somewhat abruptly and harshly, but there is nothing to support appellant's bald assertion of extremity and outrageousness, or otherwise indicating that the discharge sank to a level that is so beyond the pale as to constitute actionable conduct. Moreover, there is no evidence whatsoever that Bagwell was emotionally or psychologically fragile in any way, let alone that appellees were actually aware of his state. Consequently, the trial court did not err by entering judgment in favor of appellees on this count.

## B. Negligent Infliction of Emotional Distress

In appellant's "Negligence" count, he alleges that appellees accused Bagwell without any factual basis and "without ... regard for a full determination of the facts." Bagwell further alleges that, as a result of the accusation, he suffered physical, emotional, and mental distress. In his brief, however, appellant has not presented any argument concerning his contention that the court erred by granting judgment on this count. Accordingly, any contention of error with respect to this aspect of the judgment is not properly before us. Rule 8–131(a).

Even if we were to consider the merits of this claim, appellant would not prevail. Maryland does not recognize the tort of "negligent infliction of emotional distress" as an independent cause of action. *Abrams v. City of Rockville,* 88 Md.App. 588, 594, 596 A.2d 116 (1991). Thus, as a separate count of negligence, the claim cannot survive. Moreover, while emotional distress sometimes can be recovered as part of the damages suffered as a result of negligence, *Belcher v. T. Rowe Price Found., Inc.,* 329 Md. 709, 722–36, 621 A.2d 872 (1993) (tracing history), and such distress need not be attributable to a physical injury, *Id.,* at 734, 621 A.2d 872, a plaintiff still cannot recover for emotional distress unless the degree of the injury can be demonstrated through clearly apparent and

substantial physical manifestations that are "capable of objective determination." *Id.*, at 730–33, 621 A.2d 872 (discussing *Vance v. Vance*, 286 Md. 490, 408 A.2d 728 (1979)).

 According to Bagwell's complaint and his deposition testimony, appellant was in "total shock," became severely depressed, had difficulty sleeping, became introverted, lost his appetite, and was embarrassed to go out in public. None of these symptoms was objectively determinable. Even taken together in the light most favorable to Bagwell, it is not apparent that anyone could reasonably measure the degree of the injury from the paucity of clear physical manifestations appellant has claimed. Consequently, the court did not err in granting judgment on this count.

*C. Negligent Investigation*

 "Negligent investigation" is a peculiar variety of traditional negligence applied to the at-will employment context. Under this doctrine, an employer may be liable for terminating an at-will employee for wrongdoing under circumstances where a reasonable person would have investigated, where such an investigation would have exonerated the employee, and where the employer either failed to investigate or investigated poorly. *Crenshaw v. Bozeman Deaconess Hosp.*, 213 Mont. 488, 693 P.2d 487, 493 (1984); *Lambert v. Morehouse*, 68 Wash.App. 500, 843 P.2d 1116, 1118–20 (1993). This theory has been directly considered in only a handful of states, most of which have rejected it. *See, e.g., Gossage v. Caesar Enterprises, Inc.*, 698 F.Supp. 160 (S.D.Ind.1988) (rejecting); *Prost v. F.W. Woolworth Co.*, 647 F.Supp. 946 (D.Kan.1985) (rejecting); *Morris v. Hartford Courant Co.*, 200 Conn. 676, 513 A.2d 66 (1986) (rejecting); *Eklund v. Vincent Brass & Aluminum Co.*, 351 N.W.2d 371 (Minn.Ct.App.1984) (rejecting); *Flanigan v. Prudential Fed. Sav. & Loan Ass'n.*, 221 Mont. 419, 720 P.2d 257 (1986), *appeal dismissed,* 479 U.S. 980, 107 S.Ct. 564, 93 L.Ed.2d 570 (1986) (adopting); *Alford v. Life Savers Inc.*, 210 Neb. 441, 315 N.W.2d 260 (1982) (rejecting); *Lambert,* 843 P.2d at 1118–20 (rejecting); *Wilder v. Cody Country Chamber of Commerce,* 868 P.2d 211 (Wyo.1994) (rejecting). *Cf. Cham-*

*berlain v. Bissell, Inc.*, 547 F.Supp. 1067, 1081 (W.D.Mich. 1982) (employer has a general duty, independent of any duty not to breach the contract, to exercise due care in acting as directed by the contract).

Indirectly, Maryland has also rejected the basis of this tort, albeit not under the "negligence" rubric presented by appellant. In the context of wrongful discharge, we have held that, in an at-will employment relationship, the employer can discharge the employee for no reason or even on the basis of false facts; the employer simply has no duty to investigate allegations of employee misconduct prior to discharging the employee. *See Beery*, 89 Md.App. at 94–95, 597 A.2d 516 (1991); *cf. Happy 40, Inc.*, 63 Md.App. at 34–36, 491 A.2d 1210 (in defamation action, employer does not abuse conditional privilege by failing to investigate allegations of employee's wrongdoing).

Bagwell has not presented any Maryland case or statute imposing such a duty on appellees. Nor has he identified a contractual provision under which appellees assumed such a duty. Instead, Bagwell relies on the case of *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wash.2d 426, 815 P.2d 1362 (1991). We find *Gaglidari* inapposite. There, the employer fired an at-will employee after the employer interviewed some of the witnesses to a fight. The Washington court, reviewing the employee handbook, found that the handbook constituted an *assumption of a contractual obligation* to conduct an investigation and hold counselling sessions prior to dismissal, pursuant to the specific procedures carefully and clearly delineated in the handbook. *Id.*, 815 P.2d at 1367–68. As we have already noted, however, Peninsula's Employee Handbook did not constitute such a contractual undertaking by appellees. Consequently, *Gaglidari* does not establish that appellees had any duty to investigate.

In any event, the court properly entered judgment in favor of appellees. Tull was aware of Bagwell's version of events, and spoke with the persons who witnessed the incident. In addition, he prepared typed summaries of the interviews that

each witness acknowledged was essentially true. Although Bagwell claims that the investigation should have been performed by an outside agency, he has presented no evidence whatsoever that a more thorough investigation, by anyone, would have resulted in a different outcome, or even that appellees' investigation was actually deficient in the first instance. Also, appellant has not presented any authority supporting his claim that the employer has an affirmative duty to use outside investigators to investigate an incident whenever the employer anticipates that an investigation might result in the discharge of an employee. Accordingly, the court did not err in granting summary judgment on this claim.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**